OMERNIK, Plaintiff in error, v. STATE, Defendant in error.
[Two appeals.] *

*Nos. State 4, 5. Argued May 7, 1974.—Decided June 4, 1974.*
(Also reported in 218 N. W. 2d 734.)

---

* Motions for rehearing denied, without costs, on August 1, 1974.

For the plaintiff in error there was a brief by *Danny G. Graff* and *Graff & Schrank,* all of Madison, and oral argument by *Danny G. Graff.*

For the defendant in error the cause was argued by *Robert B. McConnell,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J. With the evidence circumstantial but sufficient to support conviction, the issues on this appeal become (1) the reach, and (2) the validity of the statute which the defendant was found to have violated.

*The statute.* The statute involved, requiring a permit from the state department of natural resources for cer-

tain diversions of water from lakes and streams, provides as follows:

"30.18 **Diversion of water from lakes and streams.** (1) WHEN DIVERSION LAWFUL. (a) It is lawful to temporarily divert the surplus water of any stream for the purpose of bringing back or maintaining the normal level of any navigable lake or for maintaining the normal flow of water in any navigable stream, regardless of whether such navigable lake or stream is located within the watershed of the stream from which the surplus water is diverted.

"(b) Water other than surplus water may be diverted with the consent of riparian owners damaged thereby for the purpose of agriculture or irrigation but no water shall be so diverted to the injury of public rights in the stream or to the injury of any riparian located on the stream, unless such riparians consent thereto.

"(2) SURPLUS WATER DEFINED. 'Surplus water' as used in this section means any water of a stream which is not being beneficially used. The department may determine how much of the flowing water at any point in a stream is surplus water.

"(3) APPLICATION FOR PERMIT. (a) It is unlawful for any person to divert water for the purposes set forth in sub. (1) without a permit. The applicant shall file an application with the department setting forth the name and post-office address of the applicant, the name of the stream, the point in the stream from which it is proposed to divert the surplus water, the name of the navigable lake or navigable stream or lands to which such water is to be diverted, the location and description of the canal, tunnel or pipes and other works through which the water is to be diverted, the amount of water to be diverted, the periods of time when it is proposed to divert such water, and the time required for the completion of the canal and other structures necessary for the completed project, which shall not be greater than 2 years from the filing of the application.

"    .    .    .

"(4) NOTICE OF HEARING ON APPLICATION. On the receipt of the application, the department shall set the application for a public hearing, notice of which shall be given by publication and by mailing a copy of the notice,

as provided in s. 31.06, to every person upon whose land any part of the canal or other structures will be located, to the clerk of the town, village or city and county in which the diversion will take place, the clerk of the town next downstream, and the clerk of any village or city through which the stream runs and which is adjacent to said municipalities in which the diversion takes place.

"(5) ISSUANCE OF PERMIT. At the conclusion of the hearing, if it appears that the water to be diverted is surplus water, or if not surplus water the riparians injured by such diversion have consented thereto, the department shall so find and shall issue a permit for the diversion of such water. No new permit shall issue for diversion of water from any trout stream designated as such by the department in publication 213–57 and subsequent revisions of said publication without prior written approval by the department. The department shall determine and fix the quantity of water to be diverted and the time when such water may be diverted. . . . The department shall annually review all permits to divert water issued since August 1, 1957. Upon making such annual review, the department may revoke any permit upon finding that the withdrawal is detrimental to other riparians or to the stream or lake and shall revoke any permit issued for diversion of water from any trout stream designated as aforesaid when it is deemed desirable to do so for conservation purposes.

"(6) DEPARTMENT TO HAVE CONTINUING JURISDICTION. The quantity of water to be taken and the time or times when it may be taken shall be under the control of the department, to the end that only surplus water be diverted from its natural channel, and that when any water in a stream ceases to be surplus water, the diversion of such water shall cease except that the department may permit the diversion of other than surplus water with the consent of the riparian owners damaged thereby."

*Nonnavigable streams.* Does sec. 30.18, Stats., apply to nonnavigable streams? (There is no claim or proof here that either Flume Creek or Klondike Creek are navigable streams.) As a penal statute, the section is to

be strictly construed,[1] but not so strictly construed as to defeat legislative intent.[2] The primary source of construing the statute is, of course, the language of the statute itself.[3] The entire section is to be considered in its construction or interpretation.[4] Thus every word appearing in a statute should contribute to the construction of the statute in accordance with its ordinary and customary meaning.[5]

Does the requirement of a permit to divert water apply only to diversions from navigable waters? We answer, "No." Sub. (3) (a) provides that it is unlawful for any person "to divert water for the purposes set forth in sub. (1) without a permit." That sub. (1) refers to "any stream" and "any navigable stream." However, the "any stream" reference is to the streams *from which* water is to be diverted to maintain normal flow elsewhere. The

[1] *Capt. Soma Boat Line, Inc. v. Wisconsin Dells* (1973), 56 Wis. 2d 838, 845, 203 N. W. 2d 369, stating: ". . . penal statutes are to be strictly construed."

[2] *State v. Vlahos* (1971), 50 Wis. 2d 609, 616, 184 N. W. 2d 817, stating: ". . . criminal statutes . . . should still be construed to give them their fair meaning in accord with the evident intent of the legislature . . . ." (Citing *United States v. Sullivan* (1948), 332 U. S. 689, 693, 68 Sup. Ct. 331, 92 L. Ed. 297.)

[3] *Nekoosa-Edwards Paper Co. v. Public Service Comm.* (1959), 8 Wis. 2d 582, 587, 99 N. W. 2d 821, stating at page 591: ". . . The meaning of a legislative act must be determined from the language used. . . ."

[4] *Wood County v. Board of Vocational, Technical & Adult Education* (1973), 60 Wis. 2d 606, 614, 615, 211 N. W. 2d 617, stating: ". . . this court can only attempt to construe a statute so that all parts have a function and meaning. If the legislature has created redundancies, it is not up to this court to create functions for such parts."

[5] *Prechel v. Monroe* (1968), 40 Wis. 2d 231, 239, 161 N. W. 2d 373, stating: " 'It is an elementary rule of statutory construction that effect must be given if possible to every *word*, clause and sentence thereof. . . .' " (Quoting *Northern Discount Co. v. Luebke* (1959), 6 Wis. 2d 313, 316, 94 N. W. 2d 605.)

"any navigable stream" reference is to the category of streams *to which* water can lawfully be diverted to maintain normal flow. The reference in sub. (1) (a) to permitting diversions of water from "any stream" to maintain normal flow in "any navigable stream" relates, as does the entire section, to the diversion of waters from "any stream," not just from "any navigable stream." This construction of sub. (1) is entirely consistent with other subsections in the particular statute. Sub. (2) refers to "any water of a stream." Sub. (3) requires that an application for a permit include "the name of the stream," the "point in the stream from which it is proposed to divert the surplus water," and the location of the canal, tunnel or works "through which the water is to be diverted." Sub. (4) refers to the clerks of cities and villages through which "the stream runs." And a provision of sub. (5), subsequently added, provides for the revocation of permit for "diversion of water from any trout stream" when it is deemed desirable so to do for conservation purposes. Considering all words, phrases and subsections of the statute, we hold that sec. 30.18, Stats., applies to diversions from nonnavigable as well as from navigable streams.

We find no constitutional barrier to the application of sec. 30.18, Stats., to nonnavigable waters. Art. IX, sec. 1 of the Wisconsin Constitution,[6] is a limitation upon

[6] Art. IX, sec. 1, Wisconsin Constitution provides: "**Jurisdiction on rivers and lakes; navigable waters.** SECTION 1. The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor."

the legislature to protect public rights in navigable waters from dissipation or diminution by acts of the legislature as trustee of such waters.[7] The limitation in sec. 30.18 upon diversions from nonnavigable waters is not inconsistent with the constitutional provision. A reversed construction of sec. 30.18 might raise the question, for, if nonnavigable tributaries upstream could be diverted or dissipated, there might be a rather dry riverbed downstream.

*Stream-to-stream.* Is the permit requirement limited to stream-to-stream diversions? We answer that it is not. It is true that sub. (1) (a) deals with the diversion of surplus water to restore the normal level or flow of navigable lakes or streams, while sub. (1) (b) deals with the diversion of nonsurplus water for the purpose of agriculture or irrigation. Both pars. (a) and (b) were originally part of the same subsection so that, until the separation of (a) and (b) into separate paragraphs, a reference to sec. 30.18 (1) included a referral to both surplus and nonsurplus waters. We do not view the separation of sec. 30.18 (1) as a single subsection into two paragraphs, numbered (a) and (b), as having any substantial consequences on the interpretation to be given the left-unchanged language. One text suggests that there is substance to the argument that sub. (1) (a) uses the word diversion to refer only to the taking of water from a stream and the moving of it to another and navigable lake or stream, and the corollary contention that ". . . the statute applied only to agricultural or irrigation withdrawals from the stream, the level of which was

[7] *See: Muench v. Public Service Comm.* (1952), 261 Wis. 492, 504, 53 N. W. 2d 514, 55 N. W. 2d 40; *Diana Shooting Club v. Husting* (1914), 156 Wis. 261, 271, 145 N. W. 816; *Priewe v. Wisconsin State Land & Improvement Co.* (1896), 93 Wis. 534, 547, 67 N. W. 918.

raised by such a stream-to-stream diversion. . . ."[8] However, the same text writers go on to observe, ". . . the legislature has amended the statute on the assumption that it applies to agricultural irrigation withdrawals from any stream, not just to streams the levels of which have been raised by stream-to-stream diversions. [Citing Ch. 436 (1957), Wis. Laws 584; Ch. 126 (1959), Wis. Laws 136.] The Wisconsin Supreme Court made a similar assumption in the 1959 *Nepco Case* . . . ."[9]

We think the text writers' comment on the interpretation given sec. 30.18, Stats., by this court on this point is accurate, although we would term it more than an "assumption." In the case referred to, the *Nekoosa-Edwards Paper Co. Case*,[10] this court decided that the department did not have authority to grant irrigation permits for diversion of nonsurplus waters without the consent of the riparian owners affected. More than implied in such holding is the authority of the department (then the commission) to grant irrigation permits for diversion of nonsurplus waters where the consent of the riparians disadvantaged thereby had been secured. In another case, the *Chain O'Lakes Case*,[11] summarizing the court's holding in *Nekoosa-Edwards,* this court stated: ". . . The statute [30.18] was found . . . to apply only to '. . . granting permits for the diversion of surplus water, and in the case of waters determined by it to be nonsurplus, only for agriculture and irrigation purposes when the riparian owners beneficially using such non-

---

[8] *See* discussion in: Ellis, Beuscher, Howard and DeBraal, *Water-Use Law and Administration in Wisconsin* (1970), pp. 234, 235, sec. 12.04c (1).

[9] *Id.* at page 235, sec. 12.04c (1).

[10] *Nekoosa-Edwards Paper Co. v. Public Service Comm., supra,* footnote 3, at page 589.

[11] *State ex rel. Chain O'Lakes Protective Asso. v. Moses* (1972), 53 Wis. 2d 579, 193 N. W. 2d 708.

surplus water have consented to such diversion. . . .' " [12] We hold that the statute is not limited to stream-to-stream diversions of water. While the testimony of witnesses before the assembly committee on commerce and manufacturers on the 1959 bill to split sec. 30.18 (1) into sec. 30.18 (1) (a) and (b) shows an understanding that the statute required permits for irrigational diversions, [13] we do not find the legislative history needed to find no legislative intent in sec. 30.18 to limit the permit-issuing authority of the department to stream-to-stream situations.

*Permit for surplus waters.* Is a permit required for the irrigational diversion of surplus water? We answer the question, "Yes." Sec. 30.18 (3), Stats., states: "It is unlawful for any person to divert water for the purposes set forth in sub. (1) without a permit." The purposes referred to in sub. (1) are three in number: (1) Replenishment of navigable lakes and streams; (2) irrigation; and (3) agriculture. It is true that sub. (1) (a) speaks of "surplus water," and sub. (1) (b) speaks of "water other than surplus water." But these references are to classifications of water, not to the three purposes for which either or both types of water can be used or diverted. It is the purposes for which the water is to be used, not the type of water used for the purpose, to which the proscription of sec. 30.18 (3) refers. The text writers, referred to in the preceding paragraph, deal with the contrary conclusion thusly, ". . . it conceivably could be argued that the statute contemplates that no permit is needed if the water to be diverted for agricultural or ir-

[12] *Id.* at page 583.

[13] *See: Minutes of the Assembly Committee on Commerce and Manufacturers* (March 18, 1959), pages 1–8. (On file at legislative reference bureau.)

rigation purposes is surplus water. . . ." [14] However, the same writers conclude, ". . . the wording of subsections (5) and (6) of the statute appear to negate such a construction, and in the *Nepco Case* the court appears to have assumed in dictum that a permit is needed to use either surplus or nonsurplus water for irrigation purposes. . . ." [15]

We agree with the text writers that the wording of subs. (5) and (6) does negate the interpretation that no permit is to be required for diversion of surplus waters. Sub. (5) provides for the issuance of a permit, after hearing, if it appears that ". . . the water to be diverted is surplus water, or if not surplus water the riparians injured by such diversion have consented thereto . . . ." Sub. (6) provides that the quantity of water and the time of its taking shall be under the continuing control of the department, and that ". . . when any water in a stream ceases to be surplus water, the diversion of such water shall cease except that the department may permit the diversion of other than surplus water with the consent of the riparian owners damaged thereby." The statement in *Chain O'Lakes* on sec. 30.18, Stats., applying to the " 'granting [of] permits for the diversion of surplus water, and in the case of waters determined by it to be nonsurplus, only for agriculture and irrigation purposes when the riparian owners beneficially using such nonsurplus water have consented to such diversion, . . .' " [16] reinforces the conclusion that a permit is required by sec. 30.18 for irrigation purposes whether the water is surplus or nonsurplus.

---

[14] Ellis, Beuscher, Howard and DeBraal, *Water-Use Law and Administration in Wisconsin, supra,* footnote 8, pp. 235, 236, sec. 12.04c (2).

[15] *Id.* at page 236.

[16] *State ex rel. Chain O'Lakes Protective Asso. v. Moses, supra,* footnote 11, at page 583, quoting *Nekoosa-Edwards Paper Co. v. Public Service Comm., supra,* footnote 10, at page 589.

*Equal protection.* Does the permit requirement deny the defendant equal protection of the laws? We answer in the negative. The defendant was required to have a permit for the diversion of water from the two creeks because he was using the diverted water for irrigation purposes. As this court said in *Chain O'Lakes*, ". . . the statute applies only to three categories of water use: Irrigation, agriculture and the bringing back or maintaining of a normal water level in stream or lake. . . ." [17] Defendant contends that by not requiring permits from industrial users the statute denies equal protection of the laws. The challenge is to the legislative classification as to who does and who does not need a permit for water diversion.

A legislative classification is presumed to be valid. [18] The burden of proof is upon the challenging party to establish the invalidity of a statutory classification. [19] Any reasonable basis for the classification will validate the statute. [20] Equal protection of the law is denied only

[17] *Id.* at page 584, the court holding that sec. 30.18, Stats., did not apply and no permit was required ". . . for water used or diverted by the new water supply facility at the Grand Army Home for Veterans at King. . . ."

[18] *State ex rel. Real Estate Examining Board v. Gerhardt* (1968), 39 Wis. 2d 701, 710, 159 N. W. 2d 622, this court stating: ". . . The court is not required under the law to find a proper basis of classification, but the classification made by the legislature is presumed to be valid unless the court can say no state of facts can reasonably be conceived that would sustain it."

[19] *Clark Oil & Refining Corp. v. Tomah* (1966), 30 Wis. 2d 547, 553, 141 N. W. 2d 299.

[20] ". . . no court is justified in declaring classification baseless unless it can say without doubt that no one could reasonably conclude that there is any substantial difference justifying different legislative treatment. . . ." *Kiley v. Chicago, M. & St. P. Ry.* (1910), 142 Wis. 154, 159, 125 N. W. 464, quoted in *Cayo v. Milwaukee* (1969), 41 Wis. 2d 643, 650, 165 N. W. 2d 198, 167 N. W. 2d 407, and *State ex rel. Hammermill Paper Co. v. La Plante* (1973), 58 Wis. 2d 32, 74, 205 N. W. 2d 784.

where the legislature has made irrational or arbitrary classification.[21] The tests to be applied in determining whether there has been a reasonable legislative classification in this state are fivefold: (1) All classification must be based upon substantial distinctions; (2) the classification must be germane to the purpose of the law; (3) the classification must not be based on existing circumstances only; (4) the law must apply equally to each member of the class; and (5) the characteristics of each class should be so far different from those of other classes as to reasonably suggest the propriety of substantially different legislation.[22] The basic test is not whether some inequality results from the classification,[23] but whether there exists any reasonable basis to justify the classification.[24]

Judicial response to a challenged legislative classification requires only that the reviewing court locate some reasonable basis for the classification made. The public policy involved is for the legislature, not the courts, to determine. Here, an obvious basis for requiring a permit for irrigation and agricultural diversions is that they are a highly consumptive use of stream water.[25] Addition-

[21] *Town of Vanden Broek v. Reitz* (1971), 53 Wis. 2d 87, 92, 191 N. W. 2d 913.

[22] *Cayo v. Milwaukee, supra,* footnote 20, at pages 649, 650, quoted and followed most recently in *State v. Mertes* (1973), 60 Wis. 2d 414, 417, 418, 210 N. W. 2d 741.

[23] *Lindsley v. Natural Carbonic Gas Co.* (1911), 220 U. S. 61, 78, 31 Sup. Ct. 337, 55 L. Ed. 369.

[24] *McGowan v. Maryland* (1961), 366 U. S. 420, 426, 81 Sup. Ct. 1101, 6 L. Ed. 2d 393.

[25] *See:* Comment, *Wisconsin's Water Diversion Law: A Study of Administrative Case Law,* 1959 Wis. L. Rev. 279, 290, footnote 32, quoting statements prepared by Walter Scott on *Wisconsin Water Resource Problems* (League of Women Voters of Madison Program, Radio Station WHA, December 11, 1957). ". . . agricultural irrigation is a *consumptive* use of water while manufacturing, domestic, and recreational uses are essentially non-consumptive in character in that they return the water to the same watershed."

ally, the three uses regulated have in common their increased demand for water in times of drought when ground and surface waters are lowest. That is as true of replenishment of water levels as it is of irrigational and agricultural usages. And this common denominator affords a reasonable basis for the classification. An argument can be made for also controlling some industrial uses of stream water. But it is not required that all ills or ailments be cured or their cure attempted in a single piece of legislation.[26] The limitation to irrigation and agriculture is a deliberate legislative decision. Following a legislatively commissioned study of the state's water use, the legislative council reported to the legislature that "[t]here is no need for broadening the present law relating to diversion of water for agriculture or irrigation so as to regulate other uses, except such broadening as may be necessary in connection with the proposed taconite development in the northern part of the state."[27] (The taconite-related recommendation was followed by the enactment of sec. 107.05 (1) to (10), Stats. 1959.) We hold the legislative classification here to have a reasonable basis, repeating that, within the limits of what is reasonable, ". . . it is for the legislature and not for the court to determine the exact point at which a classification is to operate."[28]

*Taking of property.* Does the statute deprive the defendant of property without just compensation? We an-

[26] *State ex rel. Harvey v. Morgan* (1966), 30 Wis. 2d 1, 9, 139 N. W. 2d 585, this court stating: ". . . The mere fact that the legislature in the exercise of a proper police-power function has not seen fit to cure or attempt to alleviate all the evils of poverty in a single piece of legislation does not render the classification used unreasonable."

[27] Wisconsin Legislative Council, 1959 Report, Vol. IV, *Water Resources*, at page ix.

[28] *State ex rel. Harvey v. Morgan, supra,* footnote 26, at page 9, this court also stating: ". . . A beginning must be made somewhere, and it is a legislative function to determine it. . . ."

swer the question: It does not. We start with the distinction between the power of eminent domain and the police power.[29] The former recognizes a right to compensation; the latter does not.[30] Without repeating the extended analysis of cases dealing with the distinction between eminent domain and police power in the recent enough case of *Just v. Marinette County*,[31] we see sec. 30.18, Stats., as the state's exercise of its police power to protect public rights and to prevent harm to the public by uncontrolled diversion of water from lakes and streams. While the statute does not secure for the state a benefit not presently enjoyed by its citizens, it does seek to prevent the public harm of dry riverbeds replacing flowing streams. As was said in *Just* of the wetlands preservation, the statute ". . . does not create or improve the public condition but only preserves nature from the despoilage and harm resulting from the unrestricted activities of humans." [32]

In the valid exercise of the police power reasonably restricting the use of property, ". . . the damage suffered by the owner is said to be incidental. . . ." [33] It is only where the police-power restriction is so great that ". . . the landowner ought not to bear such a burden for the public good, [that] the restriction has been held to be a constructive taking . . . ." [34] That is not the situation

[29] *See:* Freund, *The Police Power*, pp. 546, 547, sec. 511, stating: ". . . it may be said that the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful . . . ." (Quoted in *Just v. Marinette County* (1972), 56 Wis. 2d 7, 16, 201 N. W. 2d 761.)

[30] *Id.* at page 547, stating: ". . . the difference between the power of eminent domain and the police power, [is] that the former recognizes a right to compensation, while the latter on principle does not."

[31] *Just v. Marinette County, supra,* footnote 29, at pages 14–24.

[32] *Id.* at page 24.

[33] *Id.* at page 15.

[34] *Id.* at page 15.

in the case before us. We do not deal with any total ban or prohibition.[35] We have here a permit-issuing procedure that this court has held to be analogous to zoning.[36] Like zoning it affects all in a particular classification alike. We have neither right nor reason to assume that all applications for permits for diversion of water for agricultural or irrigation purposes have been or will be denied.[37] The defendant, who filed no applications for permits, would have doubtful standing to assert any such contention. Sub. (5) provides for a hearing on an application and further that ". . . if it appears that the water to be diverted is surplus water, or if not surplus water the riparians injured by such diversion have consented thereto, the department shall so find and shall issue a permit for the diversion of such water. . . ." The department is to determine the amount of water and time factor for the diversion, and to make an annual review and have continuing jurisdiction over the situation. We find nothing unreasonable in the procedure mandated. Nor do we find involved any constructive taking, nor any burden involved that the landowner ought not bear. Given the public interest in preventing the uncontrolled diversion and consumption of stream waters, we do not find any balancing merit to defendant's contention that

[35] See: Bino v. Hurley (1956), 273 Wis. 10, 16, 21, 76 N. W. 2d 571, holding that a municipal ordinance prohibiting owners of land surrounding a lake from bathing, boating, or swimming therein was an unconstitutional taking.

[36] Just v. Marinette County, supra, footnote 29, at page 22, stating: ". . . It is observed that a use of special permits is a means of control and accomplishing the purpose of the zoning ordinance as distinguished from the old concept of providing for variances. The special permit technique is now common practice and has met with judicial approval . . . ."

[37] See: Water-Use Law and Administration in Wisconsin, supra, footnote 8, p. 229, sec. 12.04b, citing figures to show that, at the end of 1966, a total of 222 permits had been issued for water diversion under sec. 30.18, Stats., with only 65 applications denied, dismissed or withdrawn.

he may do as he wishes, not only with his property but with the water of the stream that flows through his land. No case of constructive taking or unreasonable burden is here spelled out.

*Amendment of complaint.* Did the amending of the complaint in one case constitute prejudicial error? We answer that it did not. This caboose on a long train refers to the Flume Creek case in which the complaint originally charged defendant with two counts of unlawfully diverting water other than surplus water. On the morning of the trial, the complaint was amended in three respects— references to "other than surplus water" and "to the injury of public rights in the stream" were deleted and reference to sec. 30.18 (1) (b), Stats., as the subsection referred to by sec. 30.18 (3) was added. Sec. 971.29 (2) allows the court to amend a complaint at trial to conform to the proof where not prejudicial to the defendant.[38] The defendant never objected at any point to the fact that the complaint failed to list which part of sec. 30.18 (1), (a) or (b), the violation of sec. 30.18 (3) was alleged to refer to. The addition of the exact reference clarified the charge and, if anything, aided the defense by making more precise the reference involved. The deletions from the complaint reduced from five to three the elements of the crime which the state was required to establish. We would hold that an attorney, properly prepared to defend or negate five elements of an alleged criminal offense, faces no additional burden when the number of elements involved is reduced from five to three. We find no ground for reversal in the trial court's granting of the state's motion to amend its complaint.

*By the Court.*—Orders affirmed.

---

[38] Sec. 971.29 (2), Stats., providing: "At the trial, the court may allow amendment of the complaint, indictment or information to conform to the proof where such amendment is not prejudicial to the defendant. . . ."