ANTHONY S. EARL, Secretary Department of Natural Resources
JOANNE DUREN, Chairperson Assembly Tourism, Recreation andEconomic Development Committee
I have received requests from both the Department of Natural Resources and the former Assembly Natural Resources Committee to address the matter of the authority under sec. 29.50, Stats., of the Department of Natural Resources to withhold stocking of fish from state hatcheries into waters that lack sufficient public access. Because your requests for information overlap, I am responding in this joint fashion, to you as, respectively, Secretary of the Department of Natural Resources and Chairperson of the new Assembly Tourism, Recreation, and Economic Development Committee.
You are concerned about the relationship between and the effect of secs. 29.50 and 30.77, Stats. The Conservation Act, sec.23.09, Stats., charges the Department of Natural Resources ["Department"] with providing, among other things, a "system for the protection, development and use of . . . fish . . . [and] lakes . . . in this state." Sec. 23.09 (1), Stats. The Department is authorized by sec. 23.09 (2) (f), Stats., to provide management services for state waters, and this same statutory section lays the foundation for the Department's engaging in fish-stocking of any state waters. Section 29.50, Stats., though, states that the Department "shall not furnish fish or fry from state hatcheries to private ponds, private clubs, corporations or preserves, and shall not plant them in waters where the general public is not allowed the rights and privileges enjoyed by any individual." By sec. 30.77 (1) (b), Stats., local government units are prohibited from enacting "any local regulation which in any manner excludes any boat from the free use of the waters of this state." Any municipality may, however, "charge reasonable fees for the use of public boat launching facilities owned or operated by it," sec. 30.77 (3)(b), Stats.
It has been the practice of the Department to construe these statutory provisions together. In deciding where to stock its fish, the Department has traditionally considered the accessibility of a body of *Page 235 
water to the public. Moreover, it has traditionally measured adequacy of public access by the amount and character of public parking facilities, Wis. Adm. Code section NR 1.90 (2)(a)(1), (2)(a)(2), and by the reasonableness of any entry fee charged for the use of a body of water, Wis. Adm. Code section NR 1.90
(2)(a).
A reasonable fee for the use of access sites has been defined as one consistent with "those currently charged for daily entrance to state parks and forest areas," Wis. Adm. Code sectionNR 1.92 (6)(f). Proposed Wis. Adm. Code section NR 1.93 (1), currently being reviewed in the Assembly Natural Resources Committee, similarly defines a reasonable fee for use of a vehicular access site, including use of parking facilities, as that amount "currently charged an individual vehicle for daily entrance to state parks and forest areas."
Some local government units have expressed concern that current limitations on access fees they are permitted to charge are too strict in light of the costs they may incur in establishing and maintaining access facilities. Accordingly, proposed Wis. Adm. Code section NR 1.93 also provides a means by which municipalities may petition for approval of higher fees, and it establishes criteria by which the Department may gauge the reasonableness of such requests.
As posed by Mr. Earl, the first question is:
 1. Section NR 1.93, Wis. Adm. Code, as proposed, and section NR 1.90, Wis. Adm. Code, are based upon sections 23.09, 23.11, 29.50 and 30.77, Stats. Does the Department have authority under those sections to look to "reasonable fees" as referred to in section 30.77, Stats., in its interpretation of section 29.50, Stats.?
The Assembly Committee asks if the Department, in administering sec. 29.50, Stats., may consider the quantity of parking facilities provided.
The answer to both questions is yes. In my opinion, the Department authorized in administering its fish-stocking program to consider the adequacy of public access, measured by both the quantity of parking facilities provided and the reasonableness of the fees charged for their use. I would point out that the answer to this question and those that follow involve questions of discretion about how the *Page 236 
Department operates a program which has clear legislative authorization and not questions about whether the Department has authority to operate the program at all. A department has authority to allocate scarce resources so as to provide maximum public benefit under programs which are authorized by statute, although if the allocation formula or program is of general application and has the effect of law it must be adopted as a rule. The Department of Natural Resources not only has this general management authority but more specific authority for allocating its fish stocking program can be found in the statutes and the constitution.
Section 29.02 (1), Stats., states: "[t]he legal title to, and the custody and protection of, all wild animals within this state is vested in the state for the purposes of regulating the enjoyment, use, disposition, and conservation thereof." To accomplish these purposes, the Department is authorized, among other things, to promote the abundant supply of food fishes in state waters by establishing state hatcheries for the propagation of fish for stocking. Sec. 29.51, Stats. The Department is prohibited, however, from using state hatcheries to supply fish for "waters where the general public is not allowed the rights and privileges enjoyed by any individual," sec. 29.50, Stats. The obvious purpose of this limitation on stocking is the prevention of the stocking of bodies of water accessible only to riparians.
In addition to the statutory support, the Wisconsin Constitution supports the appropriateness of the Department's consideration of the quantity of, and fees charged for, access facilities. In Wisconsin, navigable waters are held in trust by the state for the public's use. Wis. Const. art. IX, sec. 1;State v. Public Service Commission, 275 Wis. 112, 81 N.W.2d 71
(1957). Indeed, the public trust doctrine may even extend beyond navigable waters: "[e]arly decisions frequently spoke of navigation, often in a commercial sense, as the purpose of the trust, but all public uses of waters have from time to time been recognized, including pleasure boating, sailing, fishing, swimming, . . . and enjoyment of scenic beauty," State v. PublicService Commission, 275 Wis. 112, 118, 81 N.W.2d 71, 74 (1957). (Even assuming arguendo that the constitutional trust doctrine were directed solely to navigable waters, Wis. Const. art. IX, sec. 1 does not bar the Legislature's protecting nonnavigable waters so long as the legislative action is not inconsistent with the constitutional provision, Omernick [Omernik] v. State, 64 Wis.2d 6,218 N.W.2d 734 (1974).) *Page 237 
Thus, any determinations about the use of waters held in trust for the public, whether made by the Legislature or the Department of Natural Resources, must be consistent with that trust. Local public interests may interfere with the public trust in the same manner as private interests, because many aspects of local regulation are as inconsistent with the broad public interest as are projects of private enterprises. 61 Op. Att'y Gen. 131, 133 (1972).
A locally imposed user or access fee designed to help local residents bear the cost of access facilities that are also used by the public at large undeniably burdens the right of the general citizenry to enjoy the body of water whose access is thus regulated. Nevertheless, the Wisconsin Supreme Court has held that the trust doctrine does not prevent minor accommodations between the interests of the public at large and a more limited set of public or private interests where the purposes of the trust are not thereby substantially affected. See, e.g., Madisonv. State, 1 Wis.2d 252, 83 N.W.2d 674, 677 (1957); State v.Public Service Commission, 275 Wis. 112, 118, 81 N.W.2d 71, 74
(1957); Angelo v. Railroad Commission, 194 Wis. 543,217 N.W. 570, 577 (1928); Milwaukee v. State, 193 Wis. 423, 454-456,214 N.W. 820, 830 (1927); Franzini v. Layland, 120 Wis. 72, 82,97 N.W. 499, 500 (1903).
In my opinion, a reasonable fee represents a permissible accommodation between the competing interests involved. A high fee, however, might discourage or severely restrict members of the general public in their use of the resource for fishing, boating, or other recreational or scenic purposes. Such a result would obviously contravene the purposes of the public trust policy, i.e., to ensure that the state's public waters are available for all to enjoy. It is elementary that fishing is among the public rights protected under the trust doctrine.Muench v. Public Service Commission, 261 Wis. 492, 53 N.W.2d 514
(1952). The general public is entitled to share with local residents of the area containing the stocked water the benefits of any stocking done from state fish hatcheries; consequently, the Department must consider the availability for public use of any body of water it stocks. Because public access might be restricted by the charging of high fees, the Department may consider the matter of fees in making any finding as to adequacy of public access. For the purposes of making this assessment, fees for parking of vehicles and *Page 238 
launching of boats must be considered as a unit. To treat them otherwise would be to ignore the reality that users of boat-launching facilities need a place to park their vehicles and boat trailers while using their boats. For the same reason, adequacy of access is also appropriately measured by the quantity of parking spaces available: limited parking facilities, just as surely as high fees for their use, might discourage or restrict use of a body of water by the general public.
There is ample statutory authority for the position stated above. Although sec. 30.77, Stats., establishes a general rule that a local government unit may not enact regulations that exclude any boat from the free use of state waters, it expressly allows a municipality to recover from users some of the costs it incurs in providing and maintaining public boat-launching facilities. Charging user fees is a customary and accepted method of imposing some of the financial burden created by public facilities on those who most directly benefit from the provision of the facilities in question. The Legislature also recognized, though, that unreasonably high fees might well discourage or exclude potential users from using state waters. The requirement of reasonableness fosters protection of the public's basic right freely to use such waters for recreational and other activities. Even though sec. 30.77 (3)(b), Stats., gives fee-charging authority to municipalities, the Department is given authority by other statutes to determine whether the fees are reasonable. The Conservation Act authorizes the Department, inter alia, to make rules and perform studies it considers necessary to carry out the provisions and purposes of the Act. Sec. 23.09 (2), Stats. One such purpose is the protection and development of state lakes, sec. 23.09 (1), Stats.; another is the maintenance of state fishing waters, sec. 23.09 (2)(d), Stats. The Department may also look to sec. 23.09 (2)(d), Stats., which speaks in terms of what the Department may do, unlike sec. 30.77, Stats., which cites activities that may be engaged in by municipalities. Section23.09 (2)(d), Stats., authorizes the Department to maintain lands and waters for fishing.
The Department also has authority to consider the adequacy of public access as measured by the quantity of parking facilities. As noted earlier, sec. 23.09 (1), Stats., authorizes the Department, among other things, "to provide an adequate and flexible system for the protection, development and use of . . . fish and game, [and] lakes . . . in this state"; and sec. 23.09
(2), Stats., confers on the Department *Page 239 
authority to effectuate that purpose through rules and services it deems necessary. That the beneficiary of any such efforts must be the general public is made clear by the public trust doctrine. Wis. Const. art. IX, sec. 1. The general public is not benefitted by any program of state fish-stocking in lakes that the general public cannot reach. Direct evidence that the Legislature was concerned with public access in creating the conservation program embodied in sec. 23.09, Stats., is found in the provision in sec.23.09 (9), Stats., for the Department's approval and partial funding of local projects to improve public access.
Further support may be found for the Department's authority to withhold fish-stocking services from lakes to which public access is inadequate because parking facilities are limited and/or unreasonable fees are imposed for their use. Section 23.09
(2)(d), Stats., discussed above, read in conjunction with sec.23.09 (2)(d), (3), Stats., authorizes the Department to "maintain" public fishing grounds, and such authority may be read to support regulation of entry fees and parking facilities related, to public fishing grounds.
Moreover, the Department is granted general rule-making power by sec. 23.11, Stats., to use such means as are reasonably necessary to ensure that the general public is the beneficiary of the Department's conservation efforts. Although, sec. 23.11, Stats., might arguably be read as applying only to the care, protection, and supervision of state-owned land — and not to public land and water generally — the Department's authority is not so narrowly circumscribed. Statutes are not to be "so strictly construed as to defeat legislative intent. . . . The entire section is to be considered." Omernick [Omernik] v. State,64 Wis.2d 6, 12, 218 N.W.2d 734, 738 (1974). In Omernick [Omernik], the statute was held applicable to nonnavigable waters because, although part of the statute regulated only "navigable streams," the statute elsewhere covered "any stream." Likewise, while sec.23.11, Stats., refers, inter alia, to "state parks" and "state land," it also speaks of "all lands . . . in which [the state] has any interest." The state holds title to the beds of navigable lakes and streams in trust for the public benefit. Section 23.11
(1), Stats., also clearly states that the powers it grants are "[i]n addition to the powers . . . heretofore conferred," and this would include the power conferred by sec. 23.09, Stats., over "lakes . . . and other outdoor resources in this state." *Page 240 
Additionally, sec. 227.014 (2)(a), (2)(b), Stats., grants the Department the power to adopt rules interpreting the statutes it enforces or administers, and the power to prescribe forms and procedures in connection with those statutes, as the Department considers necessary to effectuate the purposes of the statutes. Although "nothing in this chapter confers rule-making authority upon or augments the rule-making authority of any agency," sec. 227.014 (1), Stats., it does not diminish the rule-making authority already granted an agency by other sources — such as, in this case, the ones discussed earlier in this opinion, see
1955 Committee Note to Wis. Stat. Ann. sec. 227.014 (West). Consequently, "no agency, for fear of lack of authority, should hesitate to promulgate as rules its procedures, interpretations and general policies." Id.
Furthermore, in addition to the just-discussed authority to make rules to interpret and effectuate statutes, the Department may "exercise such legislative power as is necessary to carry into effect the general legislative purpose . . . [and] to fill up the details; [and may] make public regulations . . . directing the details of its execution." Schmidt v. Local Affairs andDevelopment Department, 39 Wis.2d 46, 59, 158 N.W.2d 306, 313
(1968). In the instant matter, the Department's consideration of the quantity of and charge for parking facilities is a permissible approach under Schmidt to the following language: "waters where the general public is not allowed the rights and privileges enjoyed by any individual," sec. 29.50, Stats.; and "excludes any boat from the free use of the waters of this state," sec. 30.77 (1)(b), Stats.
In conclusion, my advice to the Department in administering the fish-stocking program throughout the state is to continue to consider, as measures of the adequacy of public access, the number of facilities provided and the reasonableness of the fees imposed for their use.
Your second question is:
 2. If the answer to question no. 1 is yes, may the Department allow graduated fees according to the size of boat being launched or may such graduated fees be charged by a municipality in light of the wording of section 30.77, Stats.?
As stated in the answer to question one, the Legislature's authorization in sec. 30.77 (3)(b), Stats., to local governments to charge user fees for boat-launching facilities indicates a recognition that *Page 241 
such facilities cost money and that user fees may be necessary to help defray these costs. Accordingly, any determination about the reasonableness of the fee a municipality seeks to charge logically takes into account the cost of maintaining the facilities it has provided.
In proposed Wis. Adm. Code section NR 1.93 (1), the Department has administratively defined a reasonable fee for boat-launching as any fee less than or equal to that which the state imposes on vehicles for daily entrance to state park and forest areas. This definition eliminates the necessity of evaluating on an individual basis the imposed fees' reasonableness relative to costs incurred at every launch site in the state. In my opinion, however, there is no legal obstacle to Department approval of a higher fee, so long as the determination rests on an evaluation of the costs associated with operating and maintaining the site or sites in question. Proposed Wis. Adm. Code section NR 1.93
requires that such a determination be made before the Department may grant a local government unit the authority to impose a user fee higher than the amount stated in subsection (1) of that section.
If extraordinary or unusual costs are involved in accommodating large boats at launching facilities, I see no legal barrier to Department approval of a fee plan designed to attempt to defray such extra costs by charging a proportionately higher fee to the members of the public who benefit more directly from those expenditures, i.e., the owners of large boats. Such approval would depend, of course, on adequate documentation by the locality that the requested "surcharge" is directly related to additional expenses incurred solely or primarily for boats of a larger size. As a practical matter, it may be very difficult to apportion operation and maintenance costs among users according to the size of their boats. But where extra costs can be documented, a surcharge may be permissible, provided that it remains reasonable and is not designed to prevent owners of large boats from using the body of water in question or does not in fact severely restrict their access.
Your third question is:
 3. If the answer to question no. 1 is yes, must access or boat launching fees be reasonable at all times, or may they differ depending on the time of day? *Page 242 
In my opinion, there is no authority for approval of a fee that is unreasonable at any time. As explained above, although the Legislature saw the need to allow municipalities to charge user fees to help recover costs, the protection of public rights in navigable waters requires that individual users be spared high fees that would discourage or restrict them in the exercise of these rights. An unreasonable fee could work just such an impermissible result regardless of the time of day or year it was imposed. It should be noted, however, that the ban on unreasonable fees would not prevent approval of a fee schedule that imposed different fees at different times so long as every fee charged were a reasonable one. Accord, Proposed Wis. Adm. Code section NR 1.93.
Your fourth question is:
 4. Section 29.50, Stats., provides in part that fish or fry from state fish hatcheries shall not be planted in "waters where the general public is not allowed the rights and privileges enjoyed by any individual." (Emphasis added.) Does the Department's management power or rule-making authority grant flexibility in defining the phrase "any individual" or must it be defined in a literal sense to mean all persons including handicapped, etc.?
The legislative intent as disclosed by the statutes is that the Department shall have some flexibility in this matter. Thus, for example, the Conservation Act, sec. 23.09 (1), Stats., grants the Department authority to provide "an adequate and flexible system for the protection, development and use of forests, fish and game, lakes, streams, plant life, flowers and other outdoor resources in this state"; subsection (2) of the Act empowers the Department to make all rules and establish all services necessary to carry out the provisions and purposes of the Act. One acknowledged aspect of the objective stated in sec. 23.09 (1), Stats., is fish — or fry — stocking from state hatcheries in order to promote the abundant supply of food fishes in the waters of the state. With stocking, as with other activities consistent with the purpose of the Conservation Act, the Department has flexibility. See also sec. 23.11 (1), Stats., which confers on the Department certain general powers. In addition, sec. 23.09 (9), Stats., authorizes the Department to investigate local government units' plans for acquiring or improving lands in order to provide public access, and then to give financial assistance to such units for their use in implementing departmentally approved access projects. *Page 243 
Numerous other statutes assign to the Department in very broad terms the responsibility for safeguarding public rights in our water resources. See, e.g., sec. 144.025, Stats., by which the Legislature has designated the Department, in the area of pollution control, "the central unit of state government to protect, maintain and improve the quality and management of the waters of the state" and has granted the Department all "necessary powers . . . for the enhancement of the quality management . . . of all waters of the state." See also, e.g., chs. 29, 30, 31, 33, and 147, Stats. Thus, the presumption is strong that the Legislature intended the Department also to have flexibility in the area of responsibility involved in the instant matter.
The object of the stocking site limitation contained in sec. 29.50, Stats., is to ensure that the benefits of state fish management services provided to any body of water are available for use and enjoyment by the general public, not just by riparians. The public generally can enjoy these benefits if adequate parking and boat-launching facilities are provided at reasonable cost to users. The Legislature has not mandated that any specific facilities be provided; therefore, it must be presumed that it left to the Department's decision the matters addressed in your fourth question. This conclusion is consistent with the departmental flexibility envisioned in, e.g., sec. 23.09
(1), Stats., and discussed above. The conclusion is also supported by the absence of statutes directed at providing handicapped persons full access to public waters. Section 30.90, Stats., for example, requires only one particular lake, Lake Lions, to have public access provided in a manner that will not interfere with recreational use of the lake by the physically handicapped, as long as such use continues. Another statute aimed at increased access by handicapped persons covers only public buildings and places of employment that one might reasonably expect to be used by such persons; it makes no reference to outdoor resources, and among its exemptions the statute lists boathouses. Sec. 101.13, Stats.
Therefore, I am convinced that the Department is not required to construe sec. 29.50, Stats., as your question may suggest. Nonetheless, I believe that as a matter of sound and enlightened policy, the Department could encourage the provision of facilities for the handicapped wherever practicable. *Page 244 
Your fifth question is:
 5. In the Department's interpretation of section 29.50, Stats., must access be afforded to all boats regardless of size before management services may be provided to a body of water?
Very generally speaking, the answer is yes. Under both the terms of its broad duty under the public trust doctrine and the specific prohibition in sec. 29.50, Stats., against stocking private bodies of water, the Department may not provide such management services where the general public is not benefitted. As members of the general public, owners of large boats are presumed to be entitled to share the benefits of these management services in equal measure with all others.
Nevertheless, if it were determined that equal access by large boats as well as small would disserve the public interest, appropriate use restrictions could be imposed consistent with the public trust and statutory prohibition. In this regard it is important to note sec. 30.77 (3)(a), Stats., which allows all municipalities on a lake to enact, subject to advisory review by the Department, identical ordinances "relative to the equipment, use or operation of boats or relative to any activity regulated by secs. 30.60 to 30.71." In Menzer v. Village of Elkhart Lake,51 Wis.2d 70, 81-83, 186 N.W.2d 290, 294 (1971), the court indicated approval of municipal ordinances, enacted under the authority of sec. 30.77, Stats., prohibiting power boating on Sundays, if necessary to serve the public health and safety. The public welfare might likewise require some regulation of larger boats on certain lakes.
Your sixth question is:
 6. In its interpretation of section 29.50, Stats., may the Department require that an access site be open to the public at all times?
The answer is yes. As already discussed, the purpose of prohibiting planting of fish or fry in waters "where the general public is not allowed the rights and privileges of any individual," sec. 29.50, Stats., is to ensure that such services do not obtain to the sole benefit of riparians. Riparians, of course, are naturally situated to enjoy the benefits of management services at any time of the day or year *Page 245 
regardless of whether public access is provided. The Department legally may require that the public likewise have access to those advantages at all times.
This is not to say, however, that the Department is bound to require public access at all times. Indeed, in some circumstances, limiting access may be the only way to "protect" the water as mandated, for example, in secs. 23.09 and 23.11, Stats. Additionally, both riparians and the general public are equally subject to such other general regulations as may exist, such as those limiting fish and game hunting seasons to certain times of the year.
BCL:NLA