STATE of Wisconsin, Plaintiff-Respondent,

v.

James KING, Defendant-Appellant.†

Court of Appeals

*No. 94–0638–CR. Submitted on briefs August 30, 1994.—Decided September 20, 1994.*

(Also reported in 523 N.W.2d 159.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven D. Phillips*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle,* attorney

general, and *Mary E. Burke*, assistant attorney general, and *Tina Burnside*.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.  James King appeals a judgment of conviction for homicide by negligent operation of a vehicle in violation of § 940.10, STATS., (hereinafter vehicular homicide) and reckless driving causing great bodily harm under § 346.62(4), STATS., (hereinafter negligent vehicular injury). First, King contends that he did not receive a fair trial due to amnesia. Second, in a postconviction motion, King moved for resentencing due to the penalty provision of the negligent vehicular injury charge, which was denied. King contends that the penalty provision for the negligent vehicular injury denies him equal protection because it irrationally authorizes a more severe punishment than under the vehicular homicide statute. Because we conclude that King's amnesia did not deprive him of a fair trial and that the legislature's appropriation of penalties in the statutes was rational, we affirm the judgment and order.

## BACKGROUND

On April 22, 1991, a Marathon County Highway Department crew was filling cracks in the pavement in the northbound lanes of Highway 51. After the crew had finished their work, they parked their patrol truck with the attached tar kettle on the shoulder of the roadway. Two crew members, including Jerry Stahel, stood near the patrol truck cleaning up. Another crew member, Fred Lee, was stationed near a pickup truck south of the work site. Attached to this truck was a flashing arrow board, which directed traffic to the left

lane. Lee's job was to remain on the roadway until the tar cooled and the road could be opened to traffic.

Three sets of diamond-shaped warning signs were placed on the northbound lanes of Highway 51 signaling drivers to reduce their speed to thirty-five miles per hour, indicating the road work ahead, that the right lane was closed and finally indicating "flag man ahead." There was enough distance between the warning signs and the road crew to give the appearance that the road crew had finished work and simply neglected to remove the warning signs.

King was a professional truck driver heading north on Highway 51 on the day in question. After passing the various warning signs, King passed a motor home on the left and continued down the road. Less than thirty seconds later, King's truck collided with the maintenance vehicles, killing Lee and injuring Stahel.

After the accident, King was taken to the emergency room of a local hospital to be examined and treated for a laceration on his forehead. King told the emergency room physician that he had no recollection of the accident. He spoke with the Mosinee police chief, recollecting very little except an orange truck and a crash. Nonetheless, King read and signed his statement prepared by the police chief. When King's amnesia persisted for more than a year after the accident, he requested a competency evaluation. At the hearing, Dr. Ralph Baker, a psychiatrist, testified that King did suffer from amnesia probably due to the concussion caused by the accident. Baker, however, concluded that King was able to assist in his own defense, except for a two-minute period surrounding the accident.

King argued that his amnesia would prevent him from receiving a fair trial. The trial court ruled that the issue of King's amnesia was appropriately addressed after trial. Over two years after the accident, King testified on his own behalf at trial. King did not remember the impact, nor did he remember giving or signing a statement at the emergency room. After the jury found King guilty of both charges, he moved to dismiss on the basis that he was denied a fair trial due to his amnesia. The court denied the motion. Subsequently, King filed a postconviction motion pursuant to RULE 809.30, STATS., asking the court to resentence him on the great bodily harm conviction because the penalty provision for that offense was irrational and, thus, unconstitutional. The trial court denied the postconviction motion, and King appeals the judgment of conviction and the order denying resentencing.

## FAIR TRIAL DISCUSSION

Whether King received a fair trial due to his amnesia requires an application of constitutional principles to facts. The appellate review of constitutional facts is independent of the trial court's determination. *State v. Woods,* 117 Wis. 2d 701, 715, 345 N.W.2d 457, 465 (1984). "The reviewing court has the duty to apply constitutional principles to the facts as found in order to ensure that the scope of constitutional protections does not vary from case to case." *State v. Turner,* 136 Wis. 2d 333, 344, 401 N.W.2d 827, 832 (1987).

The leading Wisconsin case discussing fair trials in the context of amnesiac defendants is *State v. McIntosh,* 137 Wis. 2d 339, 404 N.W.2d 557 (Ct. App. 1987). In *McIntosh,* we adopted the majority approach set

forth in *Wilson v. United States,* 391 F.2d 460 (D.C. Cir. 1968). If the defendant's amnesia is temporary, the trial might continue for a reasonable period contingent on whether the defendant's condition improves. *McIntosh*, 137 Wis. 2d at 349, 404 N.W.2d at 562. However, where the condition is permanent, as in King's case, the question of a fair trial for an amnesiac may be addressed at the end of the trial. *Id.* The trial court determines, despite the defendant's amnesia, whether the defendant had a fair trial. *Id.* After the conviction, the court may take any additional evidence considered necessary and makes a written finding on the effect of the defendant's amnesia on the trial. *Id.* In making this determination on the fairness of the trial, the following factors are to be considered:

(1) The extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer.

(2) The extent to which the amnesia affected the defendant's ability to testify in his own behalf.

(3) The extent to which the evidence in suit could be extrinsically reconstructed in view of the defendant's amnesia. Such evidence would include evidence relating to the crime itself as well as any reasonably possible alibi.

(4) The extent to which the Government assisted the defendant and his counsel in that reconstruction.

(5) The strength of the prosecution's case. Most important here will be whether the Government's case is such as to negate all reasonable hypotheses of innocence. If there is any substantial possibility that the accused could, but for his amnesia, estab-

lish an alibi or other defense, it should be presumed that he would have been able to do so.

(6) Any other facts and circumstances which would indicate whether or not the defendant had a fair trial.

*Wilson,* 391 F.2d at 463-64 (footnote omitted). After analyzing these criteria, the court decides whether the conviction should stand. *McIntosh,* 137 Wis. 2d at 350, 404 N.W.2d at 562. Applying King's facts to these criteria, we conclude that, despite his amnesia, King did receive a fair trial and thus the conviction is upheld.

### 1. *King's Ability to Consult and Assist Lawyer*

At the sentencing hearing, King's attorney stated "that Mr. King has had the ability to talk with me and make determinations as to what matters were going to be tried throughout this matter and also make decisions on whether he wanted to plead and so on." King argues, however, that he could not recall the two or so minutes surrounding the accident, and this prohibited him from helping his lawyer construct a defense to these charges. The trial court articulated at both the competency hearing and the postconviction motion hearing that King had assisted his attorney and that his testimony did support the defense presented, because the defense was closely meshed with King's inability to remember.

We agree with the trial court's conclusion. King's two or so minutes of amnesia did not irreparably damage his ability to consult and assist his attorney with the preparation of his case. Although King could not recall the accident itself, he and his attorney had the opportunity to construct a defense through information

559

that King recalled, such as his medical history, activities during hours preceding the collision and pretrial discovery of the State's reconstruction evidence. While King's limited ability to recall the accident interfered in some respects with his ability to consult or testify, this factor is outweighed by other relevant considerations.

## 2. King's Ability to Testify

King argues that he could testify on his own behalf, but that the testimony was of little value to the jury because of his amnesia. Contrary to this assertion, King's testimony on a number of issues ruled out potential causes of the accident. For instance, he testified that he was an experienced, professional truck driver, he was rested on the day in question, he had not used drugs or alcohol that day and he had good vision. Furthermore, he testified that nothing was mechanically wrong with his truck. This information is exculpatory and actually may have facilitated his case. It is a stretch to argue that this testimony was of little value to the jury in determining his guilt or innocence.

## 3. Reconstruction of the Accident

The accident was reconstructed by the State in particular detail from various extrinsic sources. King admits that the physics of the accident are not disputed. Furthermore, the trial court articulated the relevant events and their reconstruction:

> I think he was granted a fair trial because the State really could have provided no further evidence of what actually occurred. They presented all the facts of the situation between the prosecution and the defense. You have had almost every witness

who could be found and who was in the area at the time and we had a parade here testifying as to what actually occurred. I don't know that we could reconstruct or reset that incident any more precisely than the way it was presented in testimony.

Included in the testimony reconstructing the accident was a reconstruction specialist, the deputy county coroner, four county highway workers, six other motorists, three physicians, the local police chief and the wrecker operator. King called three additional motorists as witnesses. Furthermore, diagrams and photographs were in evidence. This thorough reconstruction of the accident provided the jury with ample evidence to reach a fair verdict and did not prevent King from getting a fair trial.

## 4. *Reconstruction Assistance to King*

King does not address this factor in his appellate brief. King's failure to argue or adequately brief an argument is thus deemed abandoned. *Reiman Assoc., Inc. v. R/A Adver., Inc.,* 102 Wis. 2d 305, 306, n.1, 306 N.W.2d 292, 294 n.1 (Ct. App. 1981).

## 5. *Strength of State's Case*

King argues that the State could only circumstantially discount the hypotheses of his innocence. In other words, King argues that no one but he could testify to his condition or the condition of his truck immediately before the accident and that his amnesia prevents potentially exculpatory information from being brought forward.

561

First, it is apparent from the quantity and quality of evidence regarding the reconstruction of the accident that the State had a strong case against King, albeit based on circumstantial evidence. A defendant may be found guilty on evidence that is entirely circumstantial. *State v. Poellinger,* 153 Wis. 2d 493, 501-02, 451 N.W.2d 752, 755 (1990). When evaluating a record that supports more than one inference, we "must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law."[1] *Id.* at 507, 451 N.W.2d at 757. Incredible as a matter of law means inherently incredible, such as in conflict with the uniform course of nature or with fully established or conceded facts. *Chapman v. State,* 69 Wis. 2d 581, 583, 230 N.W.2d 824, 825 (1975); *Simos v. State,* 53 Wis. 2d 493, 495-96, 192 N.W.2d 877, 878 (1972).

King sets forth two possible hypotheses of his innocence. First, he asserts that he may have encountered truck problems or vision problems, which prevented him from avoiding the collision, thus his conduct would not be criminally negligent. From the trial evidence, King points to no facts supporting the hypothesis that there were problems with his truck. On the contrary, King's own testimony reveals that he personally checked the truck the morning of the collision and

---

[1] In *State v. McIntosh,* 137 Wis. 2d 339, 350, 404 N.W.2d 557, 562 (Ct. App. 1987), the test expounded requires the State to negate all reasonable hypotheses of innocence. This standard follows the test articulated in *State v. Wyss,* 124 Wis. 2d 681, 370 N.W.2d 745 (1985), in circumstantial evidence cases. *Wyss* has been overruled by *State v. Poellinger,* 153 Wis. 2d 493, 451 N.W.2d 752 (1990). We note that *McIntosh* was decided three years before *Poellinger* overruled *Wyss.*

knew of nothing mechanically wrong, except for a small carbon monoxide leak. He also testified that he had experienced no problems with the steering or the brakes prior to the collision. Furthermore, he stipulated that the truck's tires were inflated and working at the time of the collision.

Also, there are no facts supporting the proposition that King experienced problems with his vision. King was driving north in the afternoon, thus he would not have been looking into the sun. There were no bodies of water or other permanent reflective objects in the area that may have caused glare.

Second, King asserts that he may have suffered a loss of consciousness seconds before the accident occurred. Although there was a small carbon monoxide leak, King testified that he deemed the leak insignificant. Furthermore, the examining doctor found that the carbon monoxide content of King's post-collision blood sample was consistent with that of either a truck driver or a smoker. Additionally, there is evidence that supports that King's health was good, that he had not experienced any other incidents of lost consciousness and that he was not driving erratically. The facts do not support the hypothesis that he fell asleep at the wheel because testimony indicates that he had sufficient sleep the night before the accident and that he was not tired or drowsy.

Last, there were no facts that support the inference that King experienced a blackout or seizure. Another doctor testified that King did not have brain damage or disease. The doctor testified that fainting was an extremely unlikely explanation for the collision, especially because there were no abnormal results in the tests administered to King after the accident. Also, the doctor testified that after numerous neurological

and medical tests on King, the results were normal, not indicating epileptic abnormalities. Additionally, there was no supporting evidence such as prior or subsequent blackouts or seizure experiences.

Therefore, we conclude these hypothetical defenses do not overcome the heavy burden of showing that the inferences drawn by the trial court were incredible as a matter of law. These assertions do not prove that the trial court's determination was in such conflict with fully established facts as to be inherently incredible.

### 6. *Any Other Facts or Circumstances*

This catchall section enables King to set forth any other factors or circumstances that may have impeded a fair trial. King did not set forth any other arguments other than those above.

Considering the *McIntosh* factors collectively, we conclude that King did receive a fair trial. King's amnesia is not a complete or absolute defense to his criminal negligence. As articulated in *McIntosh*, despite a defendant's amnesia, it is possible to receive a fair trial. *Id.* at 350-51, 404 N.W.2d at 562. Taking into consideration King's amnesia, we conclude that he did receive a fair trial and affirm the trial court's judgment on the conviction.

## EQUAL PROTECTION DISCUSSION

King next alleges that the statute under the traffic code, § 346.62(4), STATS., negligent vehicular injury, is unconstitutional, due to the irrationality of the applicable penalty scheme in conjunction with the criminal

code offense, vehicular homicide, under § 940.10, STATS. King contends that he was denied equal protection because the traffic code penalty irrationally authorized a more severe punishment than the criminal code statute. We disagree.

A statute is presumed to be constitutional, and the party challenging its constitutionality has the burden of overcoming this presumption. *State v. Hart,* 89 Wis. 2d 58, 64, 277 N.W.2d 843, 846 (1979). Additionally, the party asserting that a statutory classification violates the equal protection clause must prove abuse of legislative discretion beyond a reasonable doubt. *Id.* The constitutionality of a statute is a question of law that we review de novo. *State v. Hanson,* 182 Wis. 2d 481, 485, 513 N.W.2d 700, 701 (Ct. App. 1994). Under an equal protection analysis, the reviewing court will uphold that statute if a rational basis exists to support the legislative classification, unless the statute creates a classification based on a suspect criterion or involves a fundamental right. *Id.* Thus, we will only examine the statute under the rational basis analysis because a fundamental right or suspect criterion argument has not been raised.

The rational basis standard is set forth by the Wisconsin Supreme Court in *Omernik v. State,* 64 Wis. 2d 6, 218 N.W.2d 734 (1974). The supreme court articulated the applicable standard as follows:

A legislative classification is presumed to be valid. The burden of proof is upon the challenging party to establish the invalidity of a statutory classification. Any reasonable basis for the classification will validate the statute. Equal protection of the law is denied only where the

legislature has made irrational or arbitrary classification . . . . The basic test is not whether some inequality results from the classification, but whether there exists any reasonable basis to justify the classification.

Judicial response to a challenged legislative classification requires only that the reviewing court locate some reasonable basis for the classification made. The public policy involved is for the legislature, not the courts, to determine.

*Id.* at 18-19, 218 N.W.2d at 741-42 (footnotes omitted). Thus, we will not examine whether an inequality resulted from the classification, but whether there is a reasonable basis to justify the classification. *Hanson,* 182 Wis. 2d at 485, 513 N.W.2d at 701.

The jury convicted King of two offenses, vehicular homicide and negligent vehicular injury. Vehicular homicide is set forth in the criminal code pursuant to § 940.10, STATS., which reads: "Whoever causes the death of another human being by the negligent operation or handling of a vehicle is guilty of a Class E felony." The maximum penalty for a Class E felony is a fine not to exceed $10,000 or imprisonment not to exceed two years, or both. Section 939.50(3)(e), STATS. Negligent vehicular injury is in the traffic code under § 346.62(4), STATS., which provides that "[n]o person may cause great bodily harm to another by the negligent operation of a vehicle." Although this offense is in the traffic code, it is nonetheless a criminal offense. The penalty for the negligent vehicular injury is a mandatory fine of not less than $600, but no more than $2,000. Section 346.65(5), STATS. Also, the person violating § 346.62(4) may be imprisoned for not less than ninety days, but no more than eighteen months. Therefore, the imprisonment is not mandatory, but if the

trial court does sentence the offender to imprisonment, the minimum is ninety days.

The trial court sentenced King to two concurrent three-year terms of probation and the mandatory $600 fine under § 346.65(5), STATS. The conditions of probation included 500 hours of community service for the vehicular homicide charge and ninety days in jail for the negligent vehicular injury charge. King argues that while the maximum sentence under the Class E felony is greater than the less serious offense, overall, the negligent vehicular injury punishment is more severe, due to the mandatory fine and the minimum ninety days of incarceration, if the jail term is imposed. King argues that this penalty scheme is irrational. We disagree.

Examining the legislative history and intent of these two statutes, we conclude that there is a rational basis for the penalty provisions applicable to violations of §§ 940.10 and 346.62(4), STATS. Both statutes trace their penalty provisions to 1987 Wis. Act 399, which contained the recommendations of the Special Committee on Homicide and Lesser Included Offenses (the committee) appointed by the Wisconsin Judicial Council. *See* Walter Dickey, et al., *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision,* 1989 WIS. L. REV. 1323, 1325-29.

The formulations of the penalties for vehicular homicide and negligent vehicular injury were at issue in the committee discussions. The analysis started with the similar penalties for injury by negligent use of a weapon and homicide by negligent use of a vehicle or weapon, both Class E felonies. Some members of the committee asserted that this anomaly should be remedied by increasing negligent homicide to a Class D felony. Other members contended that there is no

greater culpability when death, rather than great bodily harm, results from criminal negligence. *Id.* at 1375. Eventually the inconsistency was resolved by splitting the negligent homicide statute, making homicide by negligent use of a vehicle a Class E felony and homicide by negligent use of a weapon a Class D felony. *Id.* at 1376. In order to avert another penalty anomaly, the new offense of great bodily harm by negligent use of a vehicle, under § 346.62(4), STATS., was reduced to an eighteen-month felony and put in the traffic code. Dickey, *supra*, at 1376.

Thus, the legislative intent, via the committee's work, was to punish vehicular homicide more severely than negligent vehicular injury. By moving the negligent vehicular injury offense out of the criminal code, a solution was fashioned in which the penalty classification for the homicide would be more severe than the negligent injury statute without moving the vehicular homicide penalty up to a Class D felony. King contends that the mandatory minimum provisions under the negligent vehicular injury statute are nonetheless irrational. In order to discern the legislative intent of this statute, it should be viewed in context of the traffic code and its penalty structure. One of the legislative goals of ch. 346, STATS., rules of the road, includes the objective of uniform traffic procedures and criminal protections. *See State v. Peterson,* 104 Wis. 2d 616, 622, 312 N.W.2d 784, 787 (1981). Thus, to further the goal of uniformity, the penalties for more severe violations of ch. 346, such as reckless and drunken driving, often include minimum penalty requirements. *See, e.g.,* §§ 346.65(2), 346.65(2j) and 346.65(3), STATS.

We conclude that the legislature acted rationally when it assigned the penalties of the two crimes in

question. Locating the negligent vehicular injury in the traffic code made it a lesser felony than vehicular homicide, which is a more serious crime. When it placed negligent vehicular injury in the traffic code, it did so consistently with the intent of uniformity, allowing for minimum penalties. Furthermore, the maximum fine and imprisonment pursuant to the vehicular homicide statute exceed the maximums of the negligent vehicular injury statute.

We need not examine whether there was inequality resulting from the classifications, just the basis of the classifications. In this instance, we conclude there was a reasonable, rational basis to justify the classifications and that King did not overcome the presumption that the statute was constitutional. As *Omernik* suggests, our response is to identify some reasonable basis for the classification. *Id.* at 19, 218 N.W.2d at 742. Also, we are not required to analyze the public policy considerations involved. Thus, we conclude that the penalty provision under which King was sentenced for the negligent vehicular injury did not deny him equal protection.

*By the Court.*—Judgment and order affirmed.