COURT OF APPEALS
DECISION
DATED AND FILED

August 26, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP278**

Cir. Ct. No. 1993CF934055

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT I**

---

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

CASEY M. FISHER,

      DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Milwaukee County: JEFFREY A. WAGNER, Judge. *Affirmed*.

Before Colón, P.J., Donald, and Geenen, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Casey M. Fisher appeals from an order of the circuit court[1] denying his postconviction motion for a new trial based on newly discovered recantation evidence. For the following reasons, we affirm.

## BACKGROUND

¶2 In 1994, a jury convicted Fisher of armed robbery with the threat of force and first-degree intentional homicide while armed for the shooting death of Yaser Mousa, a grocery store owner. The following evidence relevant to this appeal was presented at trial.[2]

¶3 Mousa owned a grocery store at North 25th Street and Garfield in Milwaukee. On the night of his murder, Mousa was closing the store at approximately 8:45 p.m. with his employee, Will Nelson. Three witnesses—Andre Goodman, Jay Wonders, and Andree Ward—testified that at around 8:30 or 8:45 p.m., they were near the corner where Mousa's store was located. They testified that Fisher was outside the store.

¶4 Ward and Fisher talked on the sidewalk. According to Ward, Fisher told him that he needed money and that he was going to rob the store. Wonders also testified that Fisher said that he was going to rob the store. After speaking with Fisher, Ward and Wonders then got into Ward's car and drove away with Goodman.

¶5 Nelson and Bryan Gibbs, a friend of Fisher's, testified about what happened next. Nelson testified that Fisher was one of the store's regular customers,

---

[1] The Honorable Jeffrey A. Wagner presided over Fisher's trial and all postconviction motions.

[2] For a more robust description of the trial testimony, see *State v. Fisher*, No. 2017AP868, unpublished slip op. (WI App Mar. 26, 2019).

and both Nelson and Gibbs described Fisher and Mousa as good friends. Gibbs was inside Mousa's store before Nelson and Mousa locked up. After Gibbs left the store to walk to his home about a half block away, Fisher approached him and asked if the store was still open. Gibbs said that it was closing soon, and Fisher stated that he was going to ask Mousa for a ride. Gibbs saw Fisher go to the store, where Nelson and Mousa were exiting and locking up.

¶6 Fisher approached Nelson as he was walking away from the store and asked him where Mousa was going and whether Nelson thought Mousa could give him a ride. Nelson told Fisher that Mousa was going home and that Fisher should ask him about the ride. Nelson then continued on his way. Gibbs saw Fisher talk to Mousa and then get in the passenger side of Mousa's truck. Gibbs saw Mousa drive south on 25th Street, and Mousa and Fisher were the only two in the truck. Shortly after Mousa's murder, Gibbs told police that he saw Mousa's truck turn right (westbound), two blocks south of the store. However, at trial, Gibbs denied seeing Mousa's truck turn off of 25th Street. Gibbs also told police that he remained outside his house when, about 10 minutes after Mousa drove past him, he heard around six loud, rapid gunshots, and told police that the shots sounded like they had come from a few blocks away to the southwest of his home and the store. Mousa's body was found in his truck several blocks southwest of his grocery store shortly after 9:00 p.m.

¶7 Sometime around the date of Mousa's death, another witness, Deon Wesley, was visiting his cousin, Goodman. Fisher was there, and at one point, Wesley asked Fisher why "everybody was acting all funny," and Fisher said that he "had shot at somebody by a store or something." Wesley left shortly after that and heard no other details.

3

¶8      The jury convicted Fisher of armed robbery with the threat of force and first-degree intentional homicide while armed.  Fisher was sentenced to life in prison with his first opportunity for parole in 2045 for the homicide, and a consecutive 20-year sentence for the armed robbery.

¶9      In 1996, Fisher filed a postconviction motion for a new trial alleging ineffective assistance of counsel for not presenting certain witnesses and not objecting to misstatements in a police report.  The circuit court denied Fisher's motion, and we affirmed.

¶10     In 2017, represented by the Wisconsin Innocence Project ("WIP"), Fisher filed his first WIS. STAT. § 974.06 (2023-24)[3] motion, arguing that trial counsel was ineffective for failing to present evidence that police initially investigated a different lead on the night of the shooting.  That lead was an unidentified person's hearsay statement that three men at a nearby drug house were involved in the shooting.

¶11     The circuit court concluded that Fisher's claim was procedurally barred and denied his motion.  On appeal, we affirmed after briefing on the merits, concluding that the record conclusively demonstrated that Fisher was not entitled to relief because there was no evidence linking the three men found in the drug house to Mousa's murder.  We also denied Fisher's request for a new trial in the interests of justice because it was apparent from the record that the real controversy was fully tried.

¶12     In 2022, again represented by WIP, Fisher filed his second WIS. STAT. § 974.06 motion seeking a new trial based on the alleged recantations of Wesley,

_____

[3] All references to the Wisconsin Statutes are to the 2023-24 version.

Goodman, and Gibbs. Fisher argued that these recantations justified a new trial and that they showed that the State knowingly presented false testimony at trial.

¶13 Wesley testified at trial that, shortly after the shooting, Fisher told him that he had recently shot someone near a store. In support of Fisher's 2022 motion, Wesley signed an affidavit stating that Fisher never told him that he had recently shot anyone, and that his testimony to the contrary was untrue. Wesley's affidavit also claims that police brought him and several other witnesses into a room at the police station during the investigation into Mousa's shooting, instructed them on what to say during their testimony, and threatened them with arrest if they did not testify against Fisher.

¶14 Goodman testified at trial that he saw Fisher outside of Mousa's store when he was with Ward and Wonders on the night of Mousa's murder. In support of Fisher's motion, Goodman signed an affidavit stating that he did not see Fisher outside Mousa's store that night, and that he told the prosecutor and police this information, but they did not listen to him.

¶15 The circuit court held an evidentiary hearing on the motion at which Wesley and Goodman testified. At the evidentiary hearing, Wesley testified that he had no knowledge of Mousa's shooting, that Fisher never told him that he had recently shot somebody, and that police dictated his false testimony. However, Wesley also testified that during the first day of trial, he told the court that police were forcing him to give false testimony. He claimed that he made this trial testimony under oath, on the witness stand, and in front of the jury, prosecutor, defense attorney, and Fisher. Wesley also claimed that if this exchange is not reflected in the trial transcript, that is because the court reporter "took it down incorrectly[.]"

5

¶16 Goodman gave similar testimony about his recantation. Contrary to his trial testimony, Goodman testified at the evidentiary hearing that he did not see Fisher the night of Mousa's murder, and he did not see Fisher talking with Ward and Wonders. Like Wesley, Goodman testified during the hearing that police pressured him and several other witnesses with arrest if they did not testify falsely as instructed by police. Also like Wesley, Goodman claimed that during Fisher's trial, he testified under oath in open court that police were pressuring him to give false testimony.

¶17 Gibbs died before the evidentiary hearing and before signing an affidavit. At the hearing, former WIP student Katrina Voge testified that she talked with Gibbs shortly before his death, and Gibbs was willing to sign an affidavit recanting his trial testimony. In particular, Voge testified that Gibbs recanted his trial testimony that Fisher threatened him as they were both being brought to court.[4] Voge testified that Gibbs told her that he was pressured by police to testify falsely under threat of arrest for an unrelated robbery.

¶18 The circuit court denied Fisher's motion and adopted the State's findings of fact and conclusions of law as its own. It concluded that Gibbs's recantation was inadmissible hearsay, and the recantations of both Wesley and Goodman were not credible as a matter of law. The circuit court also concluded that there was no evidence that the State presented false testimony, and there was not a reasonable probability that a jury, hearing both the new and old evidence, would have reasonable doubt as to Fisher's guilt.

---

[4] Gibbs was held in jail to secure his trial testimony because he initially failed to appear for his subpoena.

¶19    Fisher appeals the circuit court's order denying his motion for a new trial.  Fisher also asks this court to grant him a new trial in the interests of justice.

**DISCUSSION**

**I.    Gibbs's recantation is inadmissible hearsay.**

¶20    We begin by reviewing the circuit court's conclusion that Gibbs's recantation is inadmissible hearsay.  Fisher argues that Gibbs's recantation is admissible under several hearsay exceptions.  "Whether a statement is admissible under a hearsay exception ... is a question of law that we review de novo." ***State v. Joyner***, 2002 WI App 250, ¶16, 258 Wis. 2d 249, 653 N.W.2d 290.

¶21    Fisher argues that Gibbs's recantation is admissible through Voge under WIS. STAT. § 908.045(4) as a statement against Gibbs's interest. Section 908.045(4) states, in relevant part:

> A statement which was at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true.

Fisher argues that Gibbs's recantation would have tended to subject Gibbs to criminal liability for perjury and that, by admitting to lying under oath during Fisher's trial, Gibbs faced a risk of hatred, ridicule, or disgrace by society.

¶22    We reject Fisher's arguments.  As the State points out, Gibbs could not have been subjected to a criminal prosecution for lying under oath in Fisher's 1994 criminal trial because the statute of limitations on such a charge had long run by the time Gibbs recanted.  *See* WIS. STAT. § 939.74(1) (setting six-year statute of limitations for most felonies).  Moreover, Fisher cites no authority for the novel

7

proposition that admitting to lying under oath categorically qualifies as an admission that would make Gibbs an object of hatred, ridicule, or disgrace, citing only one inapposite case and providing no further analysis. *See **Muller v. State***, 94 Wis. 2d 450, 463, 289 N.W.2d 570 (1980) (admitting to sexual relations with a man other than her husband made an individual an "object of disgrace").

¶23    While we do not develop arguments for parties, *see **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992), we make two observations. First, Gibbs claimed to have been directly pressured by police to testify falsely against Fisher. In that context, it is difficult to understand why, if Gibbs admitted to succumbing to that pressure, he would be the object of hatred, ridicule, or disgrace. Second, if we were to accept Gibbs's argument, it would indicate that there was a general rule that *all* hearsay recantation evidence is admissible under WIS. STAT. § 908.045(4), which is not and cannot be true. "Recantations are inherently unreliable" because "[t]he recanting witness is admitting that he or she has lied under oath." ***State v. McCallum***, 208 Wis. 2d 463, 476, 561 N.W.2d 707 (1997). It is because recantations necessarily involve lying under oath that recantation testimony must always be corroborated by other newly discovered evidence. ***Id.*** The "hatred, ridicule, or disgrace" exception is limited to extreme circumstances where "the risk of social disapproval must be universally recognized to serve as a guarantee of reliability for hearsay." ***State v. Stevens***, 171 Wis. 2d 106, 115, 490 N.W.2d 753 (Ct. App. 1992). Under Fisher's argument, all hearsay recantation testimony would have guarantees of reliability because recantations necessarily involve lying under oath which would subject the declarant to the risk of social disapproval. Fisher does not explain why the very quality that makes recantations inherently unreliable serves as a guarantee of reliability when the recantation is hearsay.

¶24     Fisher argues that the exception to the hearsay rule in WIS. STAT. § 908.045(6) applies to Gibbs's statements because they contain the same circumstantial guarantees of trustworthiness as Wesley's and Goodman's recantations. We disagree.

¶25     Under WIS. STAT. § 908.045(6), "[a] statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness" is not excluded by the hearsay rule. Though often called the "residual" hearsay exception, it "is not a 'catch-all' or 'near miss' category that permits the admissibility of otherwise unacceptable hearsay." *Stevens*, 171 Wis. 2d at 120. The exception exists "for the novel or unanticipated category of hearsay that does not fall under one of the named categories, but which is as reliable as one of those categories." *Id.* Accordingly, "[i]t is intended that the residual hearsay exception rule will be used very rarely, and only in exceptional circumstances." *Id.* Fisher makes no argument why Gibbs's statement or the circumstances under which he gave it satisfy this exception. *See Pettit*, 171 Wis. 2d at 646. Moreover, to the extent Fisher argues that Gibbs's statements bear the same circumstantial guarantees of trustworthiness as do Wesley's and Goodman's recantations, we explain later in this opinion that those recantations are not credible as a matter of law. Gibbs's statements cannot demonstrate circumstantial guarantees of trustworthiness when it relies on testimony the court found to be incredible.

¶26     Finally, Fisher argues that Gibbs's statement is constitutionally admissible under *Chambers v. Mississippi*, 410 U.S. 284 (1973), because Gibbs's recantation is central to his defense, has sufficient assurances of trustworthiness, and the statements would impeach other witnesses' testimonies. We disagree because Gibbs's recantation lacks sufficient assurances of trustworthiness.

9

¶27 Under **Chambers**, courts consider the following factors when determining whether proffered testimony contains adequate assurances of trustworthiness to be constitutionally admissible: "(1) the confession was made spontaneously to a close acquaintance shortly after the crime; (2) it is corroborated by other evidence; (3) it 'was in a very real sense self-incriminatory and unquestionably against interest;' and (4) the declarant is available to testify." **State v. Bembenek**, 140 Wis. 2d 248, 255, 409 N.W.2d 432 (Ct. App. 1987) (quoting **State v. Sharlow**, 110 Wis. 2d 226, 233-34, 327 N.W.2d 692 (1983) and **Chambers**, 410 U.S. at 300-01).

¶28 None of these factors apply to Gibbs's statements to Voge: they were not spontaneous, Voge was not a close acquaintance, they were not made shortly after the crime, the statements were not corroborated, self-incriminatory, or unquestionably against interest, and Gibbs is not available to testify.

¶29 Accordingly, we agree with the circuit court that Gibbs's recantation is inadmissible hearsay.

## II. Wesley's and Goodman's recantations are not credible.

¶30 Having concluded that Gibbs's recantation is inadmissible hearsay, we turn to whether Fisher is entitled to a new trial based on Wesley's and Goodman's recantations. Before newly discovered evidence will justify a new trial, the following criteria must be met:

> First, the defendant must prove, by clear and convincing evidence, that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. If the defendant proves these four criteria by clear and convincing evidence, the circuit court must determine whether a reasonable probability exists that a different result would be

reached in a trial. Finally, when the newly discovered evidence is a witness's recantation, we have stated that the recantation must be corroborated by other newly discovered evidence.

*McCallum*, 208 Wis. 2d at 473-74. "A finding that the recantation is incredible" necessarily means that it cannot support a motion for a new trial because such a finding "leads to the conclusion that the recantation would not lead to a reasonable doubt in the minds of the jury." *Id.* at 475.

¶31 Here, the circuit court found that Wesley's and Goodman's recantations were incredible as a matter of law. "Incredible as a matter of law means inherently incredible, such as in conflict with the uniform course of nature or with fully established or conceded facts." *State v. King*, 187 Wis. 2d 548, 562, 523 N.W.2d 159 (Ct. App. 1994). We review the circuit court's finding for an erroneous exercise of discretion. *State v. Ferguson*, 2014 WI App 48, ¶29, 354 Wis. 2d 253, 847 N.W.2d 900.

¶32 We agree with the circuit court that the recantations were incredible. At the evidentiary hearing, both Wesley and Goodman testified that they separately told the court that police were forcing them to give false testimony against Fisher. Both men claimed that they testified at trial, under oath, on the witness stand, and in front of the jury, prosecutor, defense attorney, and Fisher, that the police instructed them to lie. No such testimony appears in the trial transcripts, although Wesley testified that the court reporter "took it down incorrectly."

¶33 The circuit court did not erroneously exercise its discretion by finding that Wesley and Goodman were incredible as a matter of law. The absence of testimony consistent with Wesley's and Goodman's claim that the police were forcing them to lie, or any reference to such claims in the transcript, proves that it

did not occur. *See King*, 187 Wis. 2d at 562. Moreover, if such an exchange *did* occur, then neither recantation would constitute newly discovered evidence. Wesley and Goodman both testified unequivocally that the jury heard evidence that they were falsely testifying against Fisher because they were being pressured to do so by police. If true, the evidence of their recantation would not have been discovered after conviction. *See McCallum*, 208 Wis. 2d at 473. It would have been discovered in real time during the trial.

¶34 Accordingly, we agree with the circuit court that the recantations of Wesley and Goodman are incredible.

### III. Fisher's *Napue* claim fails because the State did not knowingly present false evidence at trial.

¶35 Having determined that Wesley's and Goodman's recantations are incredible, we turn to Fisher's claim under *Napue v. Illinois*, 360 U.S. 264 (1959), that the State knowingly presented false evidence at trial. He asserts that the State should have known that Wesley, Goodman, and Gibbs all testified falsely at trial because police coerced and coached their testimony, and because the police knew the testimony was false, that evidence would have been attributed to the prosecution. We disagree. In *Napue*, the prosecutor failed to correct a witness's statement that the witness had received no consideration for his testimony when that same prosecutor had expressly promised the witness consideration for his testimony. *Id.* at 265. Here, the State never presented demonstrably false evidence at Fisher's trial. As we explained above, Gibbs's statements are both unreliable and inadmissible, and Wesley's and Goodman's recantations are incredible. There is no new evidence that shows that the State knowingly presented false evidence at trial. Accordingly, we reject Fisher's *Napue* claim.

## IV. Fisher is not entitled to a new trial in the interests of justice

¶36 Finally, we turn to Fisher's request that this court grant him a new trial in the interests of justice. Whether to invoke our power to grant a new trial in the interests of justice under WIS. STAT. § 752.35 is within our discretion. *State v. Avery*, 2013 WI 13, ¶23, 345 Wis. 2d 407, 826 N.W.2d 60.

¶37 Under WIS. STAT. § 752.35, we may order discretionary reversal for a new trial: (1) where the real controversy has not been tried; or (2) where there has been a miscarriage of justice. *Vollmer v. Luety*, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990). We approach a request for a new trial with great caution and will exercise our discretionary power only in exceptional cases. *Morden v. Continental AG*, 2000 WI 51, ¶87, 235 Wis. 2d 325, 611 N.W.2d 659.

¶38 Fisher cites several cases to support his argument, but none are analogous to this case. In *State v. Hicks*, 202 Wis. 2d 150, 158, 549 N.W.2d 435 (1996), the supreme court ordered a new trial in the interests of justice because critical exculpatory DNA evidence was not presented at trial, and thus, "the real controversy of identification was not fully tried." In *State v. Cuyler*, 110 Wis. 2d 133, 137, 141, 327 N.W.2d 662 (1983), the supreme court ordered a new trial because the circuit court erroneously "excluded admissible and material evidence on the critical issue of credibility" in a sexual assault case that was essentially "a credibility battle between [the defendant] and the victim[.]" Finally, in *Garcia v. State*, 73 Wis. 2d 651, 655-56, 245 N.W.2d 654 (1976), the supreme court ordered a new trial in the interests of justice because a confessed participant in a crime would have testified that the defendant was not present and did not participate.

¶39 Fisher has not demonstrated that this case presents exceptional circumstances warranting the exercise of our discretionary reversal power. As we

13

explained above, Gibbs's statements were unreliable and inadmissible, and the recantations of Wesley and Goodman were incredible. The statements do not convince us that the real controversy was not fully tried or that there has been a miscarriage of justice. Accordingly, we deny Fisher's request for a new trial in the interests of justice.

## CONCLUSION

¶40 For the foregoing reasons, we affirm the circuit court's order denying Fisher's motion for a new trial, and we deny Fisher's request that we grant a new trial in the interests of justice.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.