COURT OF APPEALS
DECISION
DATED AND FILED

April 30, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2025AP975-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2022CF176**

**IN COURT OF APPEALS
DISTRICT IV**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

ARIC L. WAY,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Iowa County: CRAIG R. DAY, Judge. *Affirmed*.

Before Blanchard, Kloppenburg, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1　PER CURIAM.　Aric L. Way appeals a judgment of conviction for first-degree intentional homicide as a party to a crime, following a jury trial, in

connection with the death of his mother, Diana. Way argues that the evidence was insufficient to support the jury's guilty verdict and that the manner in which an officer showed photos of Way to two witnesses was impermissibly suggestive. We conclude that Way has not carried his burden on either argument. We affirm.

**BACKGROUND**

¶2      On July 19, 2021, a person who had arranged to meet Diana at her house found her deceased in her bed. Diana's cause of death was determined to be carbon monoxide poisoning. The State charged Way and his son, Philip Schmidt-Way, with first-degree intentional homicide as parties to a crime, accusing them of putting a mixture of two acids in her bedroom that combined to produce dangerous levels of carbon monoxide which killed Diana. The following evidence was presented to the jury at trial.

¶3      Attorney Tia Fisher testified that she was appointed to represent Diana in a guardianship action that Way filed a few months before Diana's death, in May 2021. Way sought guardianship of Diana's estate and person, and alleged that she lacked the ability "to manage her own financial affairs and make prudent financial decisions" and to "care[] for her own personal hygiene and physical well being," "often [becoming] confused about who she is talking to." When Fisher met with Diana, she perceived Diana to be "quite cogent, clear, [and] not confused." Fisher also spoke with Diana's physician, who expressed the view that Diana was "fully competent." Fisher filed a motion to dismiss the guardianship case, which the circuit court granted in June 2021 based on the lack of a supporting medical report.

¶4      Immediately after the dismissal of the guardianship action, Diana asked Fisher to revise her will and Fisher did so. Diana told Fisher that she intended to sell her farmstead to Joel and Jennifer Meuer, who were members of the family

who had sold the farmstead to Diana and her late husband more than twenty years earlier. Diana also told Fisher that Way and Schmidt-Way did not want her to sell to the Meuers, that they were angry because they viewed the farmstead as their inheritance, and that Way filed the guardianship petition to try to stop the sale. The new will that Fisher prepared for Diana provided that Diana was "intentionally not leaving any gift or distribution to [Way]" and that she was leaving her estate to Schmidt-Way. Diana and the necessary witnesses signed the will on July 13, 2021.

¶5 A real estate broker testified that she prepared an offer to purchase the farm on behalf of Joel and Jennifer Meuer, which they and Diana signed on June 9, 2021. The parties agreed to a purchase price of $200,000, which was less than the appraised value of $430,000. Joel Meuer testified that Diana allowed him to hunt on the property for almost the entire time that she lived there, and that he performed chores for Diana, including plowing snow, mowing the fields, and trimming trees, over the same time period. Jennifer Meuer testified that she had been friends with Diana for over a decade, and that she last saw Diana just a few days before Diana's death, when the two spoke for several hours in Diana's bedroom. Jennifer further testified that there were no marks or burns on Diana's bedroom floor at that time.

¶6 Joel Meuer also testified that on the day after Diana died, he checked the trail camera aimed at her driveway, which Diana had asked him to install seven or eight years earlier. The camera had taken photos of a truck that Meuer did not recognize entering the property at approximately 1:00 a.m. and leaving at approximately 5:30 a.m. on July 19, 2021, the morning that Diana was found dead. Photos from the camera also show the same truck entering the property on July 4, 2021, at approximately 2:00 a.m. and leaving at approximately 3:00 a.m. Meuer provided the digital memory card from the trail camera to law enforcement.

¶7     Brian Cushman is an emergency medical services (EMS) provider who responded to Diana's home after she was reported unresponsive on July 19, 2021. He testified at trial as follows. When he and his partner entered Diana's bedroom that morning, their carbon monoxide detector indicated an elevated amount of carbon monoxide. Cushman was unable to find any source of carbon monoxide in or around the house. Cushman noticed a "burn mark in the floor" of Diana's bedroom, which he had not seen when he was in the room responding to calls in February and March.

¶8     Fire Chief Brian Whitehouse also testified at trial as follows. He and his crew were called to Diana's house by EMS after she was found dead, and they determined that the highest level of carbon monoxide was in the bedroom, where it presented "an unhealthy environment," and decreased as distance from the bedroom increased. The crew investigated, but was not able to find a source of the carbon monoxide. Whitehouse noticed two separate spots on the bedroom carpet that were "bare of the upper fabric that the carpet normally has," as well as other spots on the comforter and sheet that "appeared charred." Although he agreed that the marks on the carpet could be described as "burn marks," they did not display the charring around the edges that he would "expect from a traditional fire." His crew cut the carpet to investigate the carpet pad and floor underneath the burn marks, and they discovered that the pad and floor underneath the marks were saturated with liquid.

¶9     Sheriff's Deputy Travis Cliff, who reviewed the trail camera footage provided by Joel Meuer, testified at trial as follows. He identified some unique features on the Ford Super Duty truck that was the last vehicle photographed coming and going from the property before Diana was found dead. Among these features were aftermarket wheels, a bed rail, and an aftermarket decal on the front windshield. Knowing that Detective Lana Bowers had arranged a meeting with

Way at the Sheriff's office on July 20, 2021, Cliff observed Way being dropped off for that meeting and noted that the vehicle was a Ford Super Duty truck that looked like the truck in the images from the trail camera. Cliff and another officer, Deputy Rick Severson, followed the truck, eventually stopping it and arresting its driver, who was Schmidt-Way.

¶10 Detective Bowers, who interviewed Way after his arrest, testified as follows. Way told her that he no longer drove due to a medical issue, and that "a friend" had driven him to the interview. In a portion of the video of the interview that was shown to the jury, Way told the detective he had not seen Schmidt-Way in the days before or after Diana's death and that he was still "waiting for [Schmidt-Way] to come out" to Wisconsin from where he lived in Colorado.

¶11 Dr. Robert Corliss is the forensic pathologist who conducted an autopsy on Diana's body on July 21, 2021, and testified at trial as follows. Diana's cause of death was carbon monoxide poisoning. Corliss confirmed during the autopsy that Diana had underlying health issues, including cardiac disease, diabetes, kidney disease, hypothyroidism, and obesity. Corliss expressed the opinion that Diana's death was not "attributable to acute congestive heart failure," because her body did not have the markers of "a sudden cardiac event." A sample of Diana's blood taken on July 19 had a carbon monoxide level of 17.4%, and a sample collected during the autopsy had a carbon monoxide level of 16.6%. Given that the normal "acceptable range" is between "0 to 2" percent, and the fact that Diana's history of cardiovascular disease would have presented "a greater risk of experiencing toxicity from carbon monoxide," Corliss opined that carbon monoxide was "causative in her death."

¶12    After the autopsy, investigators returned to Diana's house to attempt to identify the source of carbon monoxide. Trevor Naleid, an analyst at the Wisconsin State Crime Laboratory, testified at trial as follows. The marks that he observed in the carpet from Diana's bedroom with brownish residue around the marks looked like "a chemical burn." He also observed a whitish residue around the burn marks in the carpet samples he collected. He saw burn marks and a discoloration similar to bleaching in the bedding that was on Diana's bed, samples of which he collected. Naleid collected evidence from Schmidt-Way's truck as well, including a piece of trim that had a white residue on it.

¶13    Analyst Ruth Henk, the chemistry supervisor at the Wisconsin State Crime Laboratory, testified at trial as follows. Henk tested the evidence described above. She found that the bedding from Diana's bed had chemical burns and that the burned area was acidic. She also determined that the damaged areas in the carpet sample where the carpet fibers and pile were missing showed no sign of thermal damage and looked like chemical burns. Henk found that the white residue on both the bedding and the carpet was a mixture of sodium bicarbonate (commonly known as baking soda, a chemical compound that can be used to neutralize an acid) and sodium sulfate, a substance that is a product of a reaction between sodium bicarbonate and sulfuric acid. The white substance found in Schmidt-Way's truck was tested and determined to be a mixture of sodium bicarbonate and sodium sulfate.

¶14    Henk explained that formic acid is contained in Formic Pro, a commercial product used in beekeeping, and that a drain cleaner called Amazing Liquid Fire is a commercially available product that contains sulfuric acid. If formic acid is mixed with sulfuric acid, the formic acid breaks up into gaseous carbon monoxide and liquid water. The sulfuric acid remains. Henk conducted several

experiments with these substances. When she applied Formic Pro to a carpet sample and added sulfuric acid on top of the Formic Pro, a reaction took place that destroyed the carpet fibers. Photos of these experiments were introduced as trial exhibits and published to the jury, which showed that the reaction resulted in a dark brown or black area resembling a burn that looked similar to the damaged carpet taken from Diana's room. Twenty pounds of Formic Pro could theoretically produce 1,859 liters of carbon monoxide when mixed with sulfuric acid.

¶15 The jury was also presented with the testimony of a special agent with the Division of Criminal Investigation of the Wisconsin Department of Justice who testified as follows. Internet searches associated with Way's Google account on July 16 and 17, 2021, included the terms and phrases "Columbus WI bees," "Sulfuric acid Home Depot," "What drain cleaner has the most sulfuric acid," "Sulfuric acid drain cleaner near me," "Sulfuric acid Ace Hardware," "Amazing liquid fire liquid drain opener," and "Does carbon monoxide make you hallucinate?" Google location records associated with Way's phone showed that it was in close proximity to Capital Bee Supply in Columbus, Wisconsin, and Ace Hardware in Middleton, Wisconsin, at the time the relevant internet searches were conducted.

¶16 The manager of the Middleton Ace Hardware store testified that on July 17, 2021, at 3:43 p.m., a customer paid cash for a gallon of Liquid Fire, which was the only gallon of Liquid Fire sold that month. In addition, Stacy and Richard Schneider, the owners of Capital Bee Supply, testified that Way bought a case of Formic Pro at their store on July 16, 2021.

¶17 The jury found Way guilty as charged. Way appeals.

## DISCUSSION

¶18    Way argues that there was insufficient evidence to support the jury's verdict and that the Schneiders' identification of Way was based on an impermissibly suggestive method used by law enforcement. We reject each of these arguments and affirm.

### I.  Sufficiency of the Evidence

¶19    "This court independently reviews whether the evidence was sufficient to sustain the jury verdict, 'but in so doing, we view the evidence most favorably to sustaining the conviction.'"  *State v. Hibbard*, 2022 WI App 53, ¶9, 404 Wis. 2d 668, 982 N.W.2d 105 (quoting *State v. Hanson*, 2012 WI 4, ¶15, 338 Wis. 2d 243, 808 N.W.2d 390).  "[A] defendant challenging the sufficiency of the evidence bears a heavy burden to show the evidence could not reasonably have supported a finding of guilt." *State v. Beamon*, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681.  If the evidence, including both direct and circumstantial evidence, supports more than one reasonable inference, this court "must accept and follow the inference drawn by the [jury] unless the evidence on which that inference is based is incredible as a matter of law." *State v. Poellinger*, 153 Wis. 2d 493, 506-07, 451 N.W.2d 752 (1090).

¶20    Way argues that the State's evidence that Way and Schmidt-Way caused Diana's death was insufficient because it did not include evidence of Diana's precise time of death.  Way points to the evidence that Diana suffered from obstructive sleep apnea and argues that she could have suffocated due to that condition; he asserts that the jury did not have evidence sufficient to find beyond a reasonable doubt that Diana was alive "before the defendants even arrived at her house."

8

¶21    In support of his argument, Way relies on *State v. Serebin*, 119 Wis. 2d 837, 350 N.W.2d 65 (1984). In that case, our supreme court determined that the evidence presented at trial was insufficient to support a jury's verdict of guilty on a charge of homicide by reckless conduct for a nursing home director after a resident wandered away and died from exposure. *Id.* at 851. The court stated that, because there was no evidence in the record from which the jury could reasonably have inferred that additional staff would have prevented the incident, the evidence was insufficient to prove that the director's failure to provide sufficient staff was a substantial factor in the resident's death and the prosecution theory at trial was "too speculative." *Id.* at 849-51.

¶22    At Way's trial, however, Dr. Corliss unequivocally testified that the cause of Diana's death was carbon monoxide and that "there's no question that she was exposed to carbon monoxide and was actively breathing carbon monoxide-laden environmental air at the time of her death." Corliss's testimony alone constitutes evidence sufficient for a reasonable jury to conclude that Diana died from carbon monoxide poisoning rather than from one of her medical issues, such as from complications related to sleep apnea. The jury could reasonably credit this, and Way does not argue that this testimony was incredible as a matter of law. *See State v. King*, 187 Wis. 2d 548, 562, 523 N.W.2d 159 (Ct. App. 1994) (explaining that only when evidence is "inherently incredible, such as in conflict with the uniform course of nature or with fully established or conceded facts," are we to reject a jury's inference).

¶23    Moreover, the State presented considerable evidence that Way and his son intentionally caused Diana's death by causing carbon monoxide to accumulate in her room with a reaction of formic acid and sulfuric acid. The evidence against Way was compelling. *See Poellinger*, 153 Wis. 2d at 501. The jury could

9

reasonably infer from testimony of various witnesses that Way and Schmidt-Way purchased reactants (namely Formic Pro and Amazing Liquid Fire) that would produce carbon monoxide when combined; that they entered Diana's property at approximately 1:00 a.m. in Schmidt-Way's truck and left at approximately 5:30 a.m. on the morning she died; and that they mixed these reactants in Diana's bedroom to fill it with carbon monoxide during that timeframe, causing chemical burns on her carpet and bedspread and causing them to track white residue from the neutralizing of the remaining acid with baking soda into the truck. In addition, Way's lies about not having seen his son in the days immediately before and after Diana's death support the inference that he was hiding information because he was responsible for Diana's death. In addition, the extensive evidence that Way and his son did not approve of Diana's plan to sell her farmstead—and Way's failed attempt to become her guardian in order to stop the sale—suggested a motive.

¶24 In short, *Serebin* is not analogous to this case. Way's speculative theory that Diana died before he and his son arrived at her house in the early morning hours of July 19, 2021, does not provide a basis to overturn the jury's verdict.**II. The Schneiders' Identifications of Way**

¶25 Way argues that the circuit court erred in admitting the Schneiders' identifications of Way as the person who bought a case of Formic Pro at their beekeeping supply store on July 16, 2021. Way moved to suppress this identification evidence before trial on the ground that the photo "showup" conducted by Officer Lourdes Fernandez, which included only photos of Way,

violated Way's due process rights.[1]  The following testimony from Fernandez was presented at the suppression hearing in the circuit court.

¶26     As part of her investigation into Diana's death, Fernandez approached Stacy and Richard Schneider at Capital Bee Supply on July 29, 2021, and asked them about their sales of Formic Pro.  Ms. Schneider told Fernandez that thirteen customers had purchased the product that month, twelve of whom she knew as previous customers.  While those familiar customers bought individual pouches of the Formic Pro, the new customer purchased a whole case.  Ms. Schneider provided a description of this customer as being "about six foot tall, 350 pounds, late 50s," with "a beard that passed his shirt collar."  Ms. Schneider said that this customer was approximately ten feet away from her when she was interacting with him.  She also told Fernandez that the customer was wearing a greenish sport coat, wire rim glasses, and a hat "that was kind of folded on one side."  Fernandez testified that this description was consistent with Way's appearance and clothing during the police interview of him that took place on July 20, 2021.

¶27     Ms. Schneider explained to Fernandez that she asked her husband to complete the transaction with this customer because she had to leave the store for an appointment, so Mr. Schneider took payment from the customer.  Fernandez showed the Schneiders two different photos of Way.  The Schneiders said that the first photo, in which Way appeared to be standing at a ship's helm, "looked similar" to the customer.  Fernandez testified that the Schneiders identified the person in the second photograph, which was Way's "booking photo," showing his face and

---

[1] As noted in **Roberson**, a "showup" is "an out-of-court pretrial identification procedure in which a suspect [or an image of a suspect] is presented singly to a witness for identification purposes." **State v. Roberson**, 2019 WI 102, ¶47, 389 Wis. 2d 190, 935 N.W.2d 813 (citation omitted).

shoulders before a plain background, as the person who had purchased Formic Pro on July 16, rating their confidence as an eight out of ten that they were correct.

¶28　The circuit court denied the motion to suppress, concluding that the process used by Fernandez was not impermissibly suggestive and was sufficiently reliable such that the Schneiders' identification was admissible under *State v. Roberson*, 2019 WI 102, 389 Wis. 2d 190, 935 N.W.2d 813.[2]

¶29　We review a circuit court's decision on a suppression motion in two steps. *Id.*, ¶66. First, we uphold the circuit court's findings of historical fact unless they are clearly erroneous. *Id.* Second, we independently apply constitutional principles to the facts. *Id.* In addition to the testimony presented at the suppression hearing, we may consider trial evidence in our review. *State v. Gaines*, 197 Wis. 2d 102, 106 n.1, 539 N.W.2d 723 (Ct. App. 1995).

¶30　Out-of-court identification procedures may violate due process when they are suggestive to the point that they substantially increase the likelihood of misidentification. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972). Presenting a single person (or photo) to a witness as a possible suspect is disfavored and may be impermissibly suggestive, but it is not always appropriate to suppress identification evidence resulting from such a procedure, *see id.*; the evidence may be admitted if "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances," *Roberson*, 389 Wis. 2d 190, ¶26 (quoting *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012)). It is then for the jury

---

[2] Way argues that *Roberson*, 389 Wis. 2d 190, erroneously interprets Wisconsin's constitutional guarantee of due process. The State disputes that the Wisconsin Constitution confers broader due process rights than the United States Constitution. Because Way explicitly states that this argument is presented solely to preserve it for our supreme court's review, and because we are required to apply all precedent from our supreme court, we do not address it.

to decide how much weight to give the identification evidence. *Roberson*, 389 Wis. 2d 190, ¶25.

¶31 In *Roberson*, our supreme court articulated the two-step process for evaluating the admissibility of identification evidence resulting from an allegedly suggestive procedure. First, it is the defendant's burden to show that the procedure was impermissibly suggestive. *Id.*, ¶82. If the defendant does so, the burden shifts to the State to show that, under the totality of the circumstances, the identification was nevertheless reliable. *Id.* Factors to be considered as indicia of reliability include those mentioned in *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977): (1) the witness' opportunity to view the suspect, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the suspect, (4) the witness' level of certainty, and (5) the time between the witness' interaction with the suspect and the identification. *Roberson*, 389 Wis. 2d 190, ¶35 (citing *Brathwaite*, 432 U.S. at 114).

¶32 We assume without deciding that Way met his burden of proving an impermissibly suggestive mode of identification, and we turn to the question of whether the Schneiders' identification was nonetheless reliable under the totality of the circumstances. *See Roberson*, 389 Wis. 2d 190, ¶¶68-69. We conclude that it was reliable.

¶33 First, testimony at the suppression hearing and at trial established that the Schneiders had "ample opportunity to view" Way. *See id.*, ¶69. Ms. Schneider testified that she was approximately ten feet away from Way while conversing with him at her store. Mr. Schneider, who completed the sale, interacted with Way enough to complete an invoice and take payment. Both Schneiders were able to

13

give detailed descriptions of Way's physical appearance and clothing. This factor supports the reliability of the identification evidence.

¶34    Second, both Schneiders appeared to pay a significant degree of attention to the customer. *See id.*, ¶¶70-72. Way was buying an atypical quantity of a product that the Schneiders had only sold to twelve other customers that month, all of whom Ms. Schneider knew previously. The Schneiders recalled details of their conversations with Way, including his statements to them that he was buying the Forma Pro for his sister. The attention paid also favors reliability.

¶35    The third and fifth factors mentioned in **Braithwaite** are also present here. The Schneiders provided accurate descriptions of the suspect before Fernandez showed them his photos—their characterization of his build, facial hair, age, and glasses matched Way's, and their description of his clothing matched what he wore at his police interview four days after the formic acid purchase. *See Roberson*, 389 Wis. 2d 190, ¶73. With respect to timing, the Schneiders identified Way in their meeting with Fernandez on July 29, less than two weeks after he made the purchase at their store.

¶36    Finally, there was significant additional evidence in addition to the **Braithwaite** factors supporting the reliability of the Schneiders' identification of Way. Way's internet search history and phone location, for example, suggested that he had in fact sought out and visited Capital Bee Supply.

¶37    Way emphasizes the fourth factor, the fact that the Schneiders testified to being only 80% confident in the correctness of their identifications, compared to the "100%" certainty expressed by the witness in **Roberson**. *See Roberson*, 389 Wis. 2d 190, ¶75. We conclude that the Schneiders' less-than-total certainty was

still substantial and could be considered by the jury in deciding how much weight to give their identifications.

¶38    In summary, the totality of the circumstances supports admission of the Schneiders' out-of-court identification of Way as the person who bought a case of Formic Pro from their store on July 16, 2021, because the circumstances indicate that the identification was reliable even if we assume that the method used by law enforcement was impermissibly suggestive. We reject the argument that the circuit court could not allow the identification evidence to be admitted, allowing the jurors to give it the weight that they thought it merited.

## CONCLUSION

¶39    We conclude that the State presented sufficient evidence supporting the jury's verdict against Way and that the circuit court did not err in admitting the identification evidence discussed above. For the foregoing reasons, we affirm.

*By the Court*.—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.